City of South Bend v. Martin.

Filed September 17, 1895.

---

No. 17,499.

CITY OF SOUTH BEND v. MARTIN.

MUNICIPAL CORPORATION.—*City.*—*License.*—*Hawkers and Peddlers.* —A city has power to pass an ordinance, requiring a license to hawk and peddle therein, under R. S. 1894, section 3541, empowering cities to "restrain" hawking and peddling.

| 142 | 31 |
| 142 | 697 |
| 142 | 31 |
| 157 | 178 |
| 142 | 31 |
| 161 | 259 |
| 161 | 260 |

City of South Bend *v.* Martin.

SAME.—*License.*—*Hawkers and Peddlers.*—*Interstate Commerce.*—An ordinance imposing a license on hawkers and peddlers, does not interfere with interstate commerce in the case of a peddler of chairs imported into the State before his employment begins, even though the sale by him is conditional and the title remains in the foreign owner.

PEDDLER.—*Definition of.*—*License.*—*Municipal Corporation.*—*City.* —One engaged in selling chairs within a city by going personally from house to house, selling the chairs and delivering them at the time of the sale, is a peddler within an ordinance requiring peddlers to obtain a license.

From the St. Joseph Circuit Court.

*W. Ward,* for appellant.

*J. G. Orr,* for appellee.

McCABE, J.—The appellant prosecuted the appellee before the mayor of said city, to recover the penalty of not less than $1.00 nor more than $20.00 provided in an ordinance, with a violation of which the appellee was charged in the verified complaint filed. Said complaint charged "that the defendant, on the 12th day of September, 1894, at the city * * * aforesaid, violated sections Nos. 24 and 25 of the ordinance No. 938 of said city, passed by the common council thereof on the 11th day of December, 1893, and amended August, 1894, by carrying on the business of hawking and peddling within the corporate limits of the city of South Bend, by carrying, exposing, offering and crying for sale articles of merchandise, to-wit: rattan rocking chairs, in the public streets and avenues of said city, without having a license for that purpose. That while so engaged, the defendant sold and delivered to one Emma Wright one rattan rocking chair for the sum of six dollars. That said articles of merchandise so sold were not newspapers, nor produce, nor provisions, and that said sales were not for future delivery of said chairs. That defendant is

City of South Bend *v.* Martin.

not a wholesale traveling merchant." The city recovered judgment in the mayor's court for one dollar, and the defendant appealed to the circuit court, where a trial resulted in a judgment for the defendant. The plaintiff appeals therefrom to this court. One of the questions presented by the record and briefs is whether the ordinance referred to is valid. That alone rescues the appeal from the exclusive jurisdiction of the appellate court. Acts 1891, p. 39; R. S. 1894, section 1331. The only error assigned is that the circuit court overruled appellant's motion for a new trial. The ground of the motion for a new trial is that the decision of the court was contrary to law and the evidence.

The only evidence in the cause was the following agreed statement of facts: "A. H. Ordway & Company are manufacturers of rattan chairs, residing in South Framingham, Mass., of which State they are citizens, and in which city they have their manufactory and place of business. In the prosecution of the said business they sell directly to the people of the different States, and do not sell to retail dealers in the trade. They ship their chairs from the factory to A. H. Ordway & Company, in care of their agents at different points throughout the United States."

In the prosecution of their said business, they employ men who go about from town to town in Indiana and other States of the union with the chairs, going personally from house to house, and selling the chairs on the installment plan, retaining the title in the chairs until they are fully paid for, and deliver the goods at the time the sales are made.

The defendant, William C. Martin, was an employe of the said A. H. Ordway & Company, employed by them to travel and sell their chairs in the manner stated,

upon a commission on the amount of his sales, at the time of his arrest, September 13, 1894.

The particular chairs, in which defendant was engaged in selling in South Bend, Indiana, at the time of his arrest, were shipped by the owners and manufacturers, A. H. Ordway & Company, from South Framingham, Mass., to A. H. Ordway & Company, in care of their agent at Chicago, State of Illinois, where they have a branch and repository, and there reshipped from Chicago to South Bend, Indiana.

The defendant, William C. Martin, at the time of his arrest, and before, was engaged in selling chairs within the corporate limits of the city of South Bend, by going personally from house to house within said city, and selling the chairs and delivering the same at the time of sale, and was acting solely for A. H. Ordway & Company, and the said sales were made on the installment plan, and title retained in A. H. Ordway & Company until the same are fully paid for. The common council of the city of South Bend had enacted an ordinance, in force at the time of the arrest of the said William C. Martin, entitled:

"An ordinance concerning the licensing of certain extraordinary trades and establishments. Passed December 11, 1893. Amended August 28, 1894." Section 24 of said ordinance provides as follows: "It shall be unlawful for any person to carry on the business of hawking and peddling within the corporate limits of South Bend, at wholesale or retail, by carrying, exposing or crying for sale, within any street, avenue, alley or public square of said city, or otherwise, any article of commerce without a license from said city for that purpose; Provided, this section shall not apply to the sale of newspapers, nor to produce and provisions, nor fruit of peddlers' own raising, nor to taking orders for future deliv-

ery of any kind of goods, wares or merchandise, nor to wholesale traveling merchants, and farmers, who sell only retail dealers in like commodities.

"Any person violating any section of this ordinance, shall be fined, for each offense, not less than one dollar, nor more than twenty dollars.

"Section 25.—License to hawkers and peddlers shall be signed by the mayor and countersigned, registered and delivered to the applicant by the clerk, on payment of a license fee as follows: For carrying goods by hand, one dollar per day, five dollars per week, ten dollars per month and twenty dollars per year. For selling from any kind of vehicle, two dollars per day, eight dollars per week, fifteen dollars per month, twenty-five dollars per year. The clerk for such services shall receive fifty cents for each license issued to be paid by the applicant.

"Section 26.—No license issued under any section of this ordinance shall be transferable, nor shall any person other than the person named in the license, be permitted to use the same, nor shall any license protect any person from incurring the penalties prescribed by this ordinance, except the licensee named in the license."

The defendant, William C. Martin, at the time of his arrest, was not engaged in the sale of newspapers, produce, provisions or fruit, and was not taking orders for future delivery, and was not a wholesale traveling merchant, but was selling at retail to consumers. The defendant, at the time of his arrest, had not obtained a license, as required by said ordinance. The defendant was arrested, tried, convicted and sentenced to pay a fine of $1.00 and costs, under said ordinance, before D. B. J. Schafer, mayor of said city of South Bend, September 13, 1894. If the court should be of the opinion, upon the facts stated, that the defendant was liable to pay the license fee provided by said ordinance, then

judgment to be rendered for the plaintiff for one dollar ($1.00) and costs of suit. If the court should be of opinion that the said Martin was not liable to pay, then judgment to be entered for the defendant for costs of suit.

Subdivision 23 of section 3106, R. S. 1881 (R. S. 1894, section 3541), empowers cities "To regulate the ringing of bells and crying of goods, and to restrain hawking and peddling."

It has been held by this court that this statuary provision empowers a city to pass an ordinance requiring a license to hawk and peddle in a city. *City of Huntington* v. *Cheesbro*, 57 Ind. 74.

The ordinance involved in *Graffty* v. *City of Rushville*, 107 Ind. 502, imposed a penalty on "every person who peddles, hawks, sells, or exhibits for sale, any goods, wares, or merchandise, not the growth or manufacture of Rush county, Indiana, or shall take orders for any such goods, wares or merchandise, for immediate or future delivery, about the streets, alleys, hotels, business houses, private dwellings, or at any public or private place in said city," without a license, was held void, both because it violated section 23 of article 1 of the State constitution, which provides that: "The general assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms shall not equally belong to all citizens," and because of its plain repugnance to the federal constitution, which commits to congress the exclusive power to regulate commerce among the several States. The provision in that ordinance that brought it in conflict with both constitutions, in the opinion of the court, was its discrimination against "any goods, wares or merchandise, not the growth or manufacture of Rush county, Indiana." Grafty had been taking orders from citizens of said city for shirts, socks,

City of South Bend *v.* Martin.

and men's furnishing goods, about the streets, etc., of said city, which were not of the growth or manufacture of said Rush county. That he resided in Indianapolis, and was in the employ of Paul H. Krauss, a manufacturer and dealer in such goods, residing and having his business house in the city of Indianapolis. That Grafty's manner of business was to carry samples of the different articles manufactured or sold by his employer, and exhibit them from house to house to individuals, not dealers, soliciting orders from each individual for such articles, and in such quantities, as the individual might require or purchase. The goods thus ordered were to be delivered at a future day, by express, or otherwise; he delivered no goods, nor did he carry any goods with him, except the samples.

It is easy to see that as against Grafty this ordinance under the facts was an infringement of the provision quoted from the State constitution, but it is difficult to see how, under those facts, it violated any provision of the federal constitution. It is also easy to see that a case might arise on a different state of facts that would make the ordinance void as to that case, because of its infringement of the federal constitution. For instance, had the manufacturer and dealer in these goods been a resident of another State, and had his business house there, his goods then would have been the legitimate subject of interstate commerce, and Grafty would have been engaged in interstate commerce, the exclusive power to regulate which is vested by the federal constitution in the Congress of the United States. But the facts in that case show that Grafty was not engaged in interstate commerce, but that he was engaged in *intra*-state commerce, that his commerce and trade, and by which, it was charged, he violated the ordinance, were entirely confined within the boundaries of the State of

Indiana, the power to regulate which has never been delegated by the federal constitution to Congress, but has been retained by, and belongs to, the several States. The case, however, rightly decided that the ordinance was void because of its infringement of the State constitution, but not as an infringement of the federal constitution, under the facts of that case. It will be observed that the ordinance now before us makes no discrimination, but applies to all, without regard to residence, or the place from whence the goods come.

Two questions arise under the assignment of errors, and the contention of counsel:

1. Was the business of the appellee, conducted in the manner described in the complaint and the agreed facts, within the prohibition of the ordinance against hawking and peddling?

2. Was the ordinance in question a valid exercise of the power vested in the city by the statute referred to?

The answer to both questions depends to some extent upon the answer to the question, what is hawking and peddling? Because it is that that the city is authorized to restrain; and requiring a license was held to be a restraint on such business in *City of Huntington* v. *Cheesbro, supra.* In *Grafty* v. *City of Rushville, supra*, it was said: "The extent of the power conferred upon cities by the statute, in this connection, is to restrain hawking and peddling, and any mode of selling which does not legitimately fall within these terms, cannot be made unlawful by being specially described, and restrained in the ordinance. Such sales and exhibitions of wares, and such orders for the future delivery of goods, and such only as are embraced by the terms, hawking and peddling may be restrained by ordinances duly passed under the power conferred by the statute above set out."

We must, therefore, inquire and ascertain what constitutes a hawker and a peddler. This court in the case last referred to adopted the definition of Chief Justice Shaw in *Commonwealth* v. *Ober*, 12 Cush. 493, which definition has been adopted by many courts, among them the Supreme Court of the United States in *Emert* v. *Missouri*, 156 U. S. 296. It was said by Chief Justice Shaw that : "The leading primary idea of a hawker and a peddler is that of an itinerant or traveling trader who carries goods about in order to sell them, and who actually sells them to purchasers, in contradistinction to a trader who has goods for sale and sells them in a fixed place of business. Superadded to this (though perhaps not essential), by a hawker is generally understood one who not only carries goods for sale, but seeks for purchasers either by outcry, which some lexicographers conceive as intimated by the derivation of the word, or by attracting notice and attention to them as goods for sale, by an actual exhibition or exposure of them, by placards or labels, or by a conventional signal, like the sound of a horn for the sale of fish."

Webster defines peddling as traveling about and selling small wares, and hawking as offering for sale in the streets by outcry. Another definition also adopted by this court in the case referred to, and by the Supreme Court of the United States in the case referred to, runs thus : "A peddler, petty chapman, or other trading person going from town to town or to other men's houses, and traveling either on foot, or with horse or horses, or otherwise carrying to sell, or exposing to sale, any goods, wares, or merchandise." Rapalje and Lawrence Law Dic. Tit. Hawker.

This court and the Supreme Court of the United States in the cases mentioned quote with approval another definition found in the various law dictionaries,

showing the disfavor in which the common law held the vocation, as follows: "Hawkers. Those deceitful fellows, who went from place to place buying and selling brass, pewter, and other goods and merchandise, which ought to be uttered in open market, were of old so called; and the appellation seems to grow from their uncertain wandering, like persons that with hawks seize their game where they can find it. * * Hawkers and peddlers, etc., going from town to town, or house to house, are now to pay a fine and duty to the king."

The purpose and policy of the statute in empowering cities to pass ordinances in restraint of hawking and peddling was probably two fold. One and the principal object to be attained was the protection and encouragement of local dealers and merchants, who are largely dependent for their patronage on their reputation for integrity and fair dealing, and their social and moral standing in the community; and who, by investing their means, providing fixed places of trade, and paying taxes on their merchandise help to build up and maintain the city in which they reside, and contribute to the support of its schools and other local interests and enterprises.

The other was to prevent the indiscriminate invasion of the houses and places of business of citizens, and shield them from the practices of itinerant traders of unknown repute, who may be frequently patronized by persons, in order to be rid of their importunities and presence. Under these definitions of hawking and peddling, the city was amply empowered to enact the ordinance in question. The police power vested by the statute in the city may be properly exerted to restrain all such as by their methods of doing business, are liable to invade social order, or injuriously affect the prosperity of the city, by seeking purchasers for their wares in the houses of citizens, or in the streets or public places

City of South Bend *v.* Martin.

of a city to the discouragement of the more legitimate methods of others, on whom the municipality is dependent for its support.

In *Grafty* v. *City of Rushville, supra,* it was said : "Any method of selling goods, wares or merchandise by outcry on the streets, or public places in a city, or by attracting persons to purchase goods exposed for sale at such places, by placards or signals, or by going from house to house, selling or offering goods for sale at retail to individuals not dealers in such commodities * * * constitutes the person so selling a hawker or peddler within the meaning of the statute. In this way we are brought to the conclusion that the appellant's method of conducting business was within the prohibition against hawking and peddling without being duly licensed."

The same is true in the case now before us.

The next question is, was the ordinance in question a valid exercise of the power vested in the city by the statute? The answer to that question depends upon whether the ordinance violates or infringes any of the limitations of the constitution, State or federal. It is not claimed that it violated any provision of the State constitution or infringes any of its provisions. This is practically conceded by the appellee. But he contends earnestly that it infringes that provision of the federal constitution which vests in Congress the power to regulate commerce with foreign nations and among the several States.

It is contended that the business of the appellee, and the manner in which it was conducted, as shown by the agreed statement of the facts, made it interstate commerce, and, therefore, beyond the control of the State authorities.

In support of this contention appellee's counsel cite and rely on *Brennan* v. *Titusville,* 153 U. S. 289. It

was said in that case, quoting from Chief Justice Fuller, in *Leisy* v. *Hardin*, 135 U. S. 100, that, "'The power vested in congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the constitution. It is co-extensive with the subject on which it acts and cannot be stopped at the external boundary of a State, but must enter its interior and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419. 'And while, by virtue of its jurisdiction over persons and property within its limits, a State may provide for the security of the lives, limbs, health, and comfort of persons, and the protection of property so situated, yet a subject-matter which has been confided exclusively to congress by the constitution is not within the jurisdiction of the police power of the State, unless placed there by congressional action.'"

But the facts in that case (*Brennan* v. *Titusville*) were entirely different from those in the case at bar, though at first blush they may seem to be very similar. In that case J. A. Shephard was a manufacturer of picture frames and maker of portraits, residing in Chicago, Illinois, of which State he was a citizen, and in which city he had his factory and place of business. He employed agents, who, under his direction, solicited orders for pictures and picture frames in the State of Pennsylvania, and other States of the union, by going personally to residents and citizens of said States and exhibiting samples, going, when necessary, from house to

City of South Bend *v.* Martin.

house. Brennan was an agent of Shephard, employed by him to travel and solicit orders for said articles in the manner stated, upon a salary, and also upon commission upon the amount of his sales.

Upon receiving orders for pictures and picture frames the agents of said Shephard forwarded the same to him at Chicago, Illinois, where the goods were made, and from there said Shephard shipped the goods to the purchasers in Titusville, Pennsylvania, by railroad freight and express, and the price of said goods was collected and forwarded by the express companies, and sometimes by the agents, to Shephard, at Chicago, Illinois. The agent, Brennan, employed by said Shephard, was engaged in conducting the business in the manner stated at the time of his arrest, in said city of Titusville, Pennsylvania. There was at the time in force in said city an ordinance enacted by said city of Titusville, providing "That all persons canvassing or soliciting within said city orders for goods, books, paintings, wares, or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the mayor a license to transact said business, and shall pay to said treasurer therefor the following sums, according to the time said license shall be granted," and then follows the price of the license for the different lengths of time for which they may be granted. The penalty provided for a violation of the ordinance was a fine not exceeding $100.00, nor less than the amount required for a license to such person, together with 20 per cent. added with costs of suit. The agent had not procured a license when he did the business with which he was charged. It was further said in that case, quoting from the opinion of Mr. Justice Bradley in *Leloup* v. *Mobile*, 127 U. S. 640, 645, that: "'Of course the exaction of a license tax as a con-

dition of doing any particular business is a tax on the occupation; and a tax on the occupation of doing a business is surely a tax on the business.'" And further quoting in that case, from the opinion of Mr. Justice Field, in *Welton* v. *Missouri*, 91 U. S. 275, 278, it was said: "'Where the business or occupation consists in the sale of goods, the license tax required for its pursuit is in effect a tax upon the goods themselves.'"

It was further said in the case of *Brennan* v. *Titusville*, *supra*, that: "It is clear, therefore, that this license tax is not a mere police regulation, simply inconveniencing one engaged in interstate commerce, and so only indirectly affecting the business, but is a direct charge and burden upon that business; and if a State may lawfully exact it, it may increase the amount of the exaction until all interstate commerce in this mode ceases to be possible. And, notwithstanding the fact, that the regulation of interstate commerce is committed by the constitution of the United States, the State is enabled to say that it shall not be carried on in this way, and to that extent to regulate it." And after reviewing a long line of decisions of the Supreme Court of the United States, it was said by Mr. Justice Brewer, who delivered the opinion of the court, that: "Within the reasoning of these cases it must be held that the license tax imposed upon the defendant was a direct burden on interstate commerce, and was, therefore, beyond the power of the State." For that reason the judgment of the supreme court of Pennsylvania, which had held the ordinance valid, was reversed.

It follows, therefore, from these principles well established by the decisions of the Supreme Court of the United States, the court of last resort upon such questions and whose decisions thereon are binding upon and authoritative with us, that if the goods involved in the

case now before us were the subjects of interstate commerce at the time the appellee was dealing with them, and if the appellee in selling them as he did was engaged in interstate commerce, then the ordinance he was charged with violating was void, at least as to him and that transaction.

But it will have been observed that the facts in *Brennan* v. *Titusville, supra*, as before remarked, are very different from those in the case now before us. The goods in Brennan's case, when his employment was at an end in each sale, were still in the manufacturer's possession in another State than that in which he made the sales. His employment as a "person canvassing or soliciting within said city orders for goods, etc.," was at an end so far as the restriction in the ordinance went when he transmitted the order for which he had canvassed or which he had solicited to his employer in the other State. Therefore, in taxing his occupation the goods were taxed by the ordinance before they had come into the State of Pennsylvania, and become incorporated into the mass of property in that State, and while they were in the State of Illinois. Not so under the facts in the case now before us.

Before appellee's employment can begin in any sale of chairs, as shown by the agreed state of facts, such chairs must be first shipped by their owners and manufacturers, A. H. Ordway & Co., in Massachusetts into the State of Indiana for sale by the appellee as their agent. The chairs in the regular course of business, as shown to have been conducted by the appellee, must reach their final destination and resting place in Indiana before appellee can have anything to do with them. After they reach such final destination, and not before, appellee's employment, which is taxed by the ordinance, begins.

Whether such chairs after their final destination is reached are the subjects of interstate commerce is the

turning point in this case, and is a very different question from that presented in *Brennan* v. *Titusville, supra.* There the employment of the agent ceased before the goods were shipped even, and much longer before they reached their final destination and resting place as to each particular sale. But the Supreme Court of the United States, more than one year later, on March 4, 1895, decided a case that is exactly in point, namely, *Emert* v. *Missouri, supra.*

At page 309, Mr. Justice Gray, speaking for the court, said: "The facts were agreed, that the Singer Manufacturing Company, for more than five years last past, and on the day in question, was a corporation of New Jersey; that the defendant, on and prior to that day, was in the employment of that company, and on that day, in pursuance of that employment, and having no peddler's license, was engaged in going from place to place in Montgomery county, in the state of Missouri, with a horse and wagon, soliciting orders for the sale of the company's sewing machines, and having with him in the wagon one of those machines, the property of the company, and manufactured by it at its works in New Jersey, and which it had forwarded and delivered to him for sale on its account and that he offered this machine for sale to various persons at different places, and found a purchaser, and sold and delivered it to him.

"The supreme court of the State, in its opinion understood and assumed the effect of those facts to be as follows: 'The defendant was engaged in going from place place, selling and trying to sell sewing machines, in Montgomery county, in this State, and had been so engaged for some years. He carried the machines with him in a wagon, and on making a sale delivered those sold to the purchaser. He was not only soliciting orders, but was making sales and delivering the property sold.

City of South Bend *v.* Martin.

These acts bring him clearly within the statutory defini-
tion of a peddler; and, having no license from the State,
he became liable to the penalties imposed by the statute,
unless, for any reason, he was exempt from the opera-
tions of the law.' * * * * Upon any construction,
it is clear that the defendant was engaged in going from
place to place within the State, without a license, so-
liciting orders for the sale of sewing machines, having
with him in the wagon at least one of those machines,
and offering that machine for sale to various persons at
different places, and that he finally sold it, and deliv-
ered it to the purchaser. * * *

"The defendant's occupation was offering for sale and
selling sewing machines, by going from place to place
in the State of Missouri in a wagon, without a license.
*There is nothing in the case to show that he ever offered
for sale any machine that he did not have with him at
the time.* His dealings were neither accompanied nor
followed by any transfer of goods * * from one
State to another; and were neither interstate commerce
in themselves, nor were they in any way directly con-
nected with such commerce. The only business or com-
merce in which he was engaged was internal and do-
mestic; and, so far as appears the only goods in
which he was dealing had become a part of the mass
of property within the State. Both the occupation
and the goods, therefore, were subject to the taxing
power, and to the police power, of the State. The
statute in question is not part of the revenue law. It
makes no discrimination between residents or products
of Missouri and those of other States, and manifests no
intention to interfere, in any way, with interstate com-
merce. Its object in requiring peddlers to take out and
pay for licenses, and to exhibit their licenses, on demand,
to any peace officer, or to any citizen householder of the

county, appears to have been to protect the citizens of the State against the cheats and frauds, or even thefts, which, as the experience of ages has shown, are likely to attend itinerant and irresponsible peddling from place to place, and from door to door." A large number of the decisions of that court upon that question are reviewed in the case last quoted from above, and quotations made therefrom. Quoting from *Brown* v. *Houston*, 114 U. S. 622, it is there said : "Coal brought in flat boats from Pittsburg to New Orleans was still afloat in the Mississippi river after its arrival, in the same boats, and in the same condition in which it had been brought, and was held in order to be sold on account of the original owners by the boatload. Yet this court unanimously decided that a tax imposed by general statutes of the State of Louisiana upon this coal was valid ; and speaking by Mr. Justice Bradley, said : 'It was not a tax imposed upon the coal as a foreign product or as the product of another State than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a state of transit through that State to some other place of destination. It was imposed after the coal had arrived at its destination, and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans.' 'The taxing of goods coming from other States, as such, or by reason of their so coming, would be a discriminating tax against them as imports, and would be a regulation of interstate commerce inconsistent with that perfect freedom of trade which congress has seen fit should remain undisturbed. But if, after their arrival within the State—that being their place of destination for use or trade—if, after this, they are subjected to a general tax laid alike on all property

within the city, we fail to see how such a tax can be deemed a regulation of commerce, which would have the objectionable effect referred to."

And it was there further said: "In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, indeed, the majority of the court held that a statute of Tennessee requiring 'all drummers, and all persons not having a regular licensed house of business in the taxing district, offering for sale or selling goods, wares or merchandise therein by sample,' to pay a certain sum weekly or monthly for a license, was, as applied to persons soliciting orders for goods on behalf of houses doing business in other States, unconstitutional as inconsistent with the power of congress to regulate commerce among the several States. * * * The distinction on which that judgment proceeded is clearly brought out in the following passages of the opinion : 'As soon as the goods are in the State and become a part of its general mass of property, they will become liable to be taxed in the same manner as other property of similar character, as was distinctly held by this court in the case of *Brown* v. *Houston*, 114 U. S. 622. When goods are sent from one State to another for sale, or in consequence of a sale, they become part of its general property, and amenable to its laws; provided that no discrimination be made against them as goods from another State, and that they be not taxed by reason of being brought from another State, but only taxed in the usual way as other goods are. *Brown* v. *Houston, qua supra; Machine Co.* v. *Gage*, 100 U. S. 676. But to tax the sale of such goods, or the offer to sell them, before they are brought into the State, is a very different thing, and seems to us clearly a tax on interstate commerce itself. The negotiation of sales of goods which are in another State, for the purpose of introducing them into

the State, in which the negotiation is made, is interstate commerce."

And quoting from the opinion of Mr. Justice Field, in *Welton* v. *Missouri*, 91 U. S. 275, involving a State statute discriminating against goods from other States, it was further said, in *Emert* v. *Missouri, supra,* that: "The commercial power continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin."

In the case now before us, the goods, as shown by the agreed state of facts, had been sent by the owners and manufacturers from one State into another, from Massachusetts to Indiana, for sale, reaching their final destination and resting place before they were sold or offered to be sold, and before appellee's employment in connection with them commenced. His employment was taxed by the ordinance, and that was, under the authorities cited, a tax upon the goods themselves, it is true, but before such employment begun, the goods had reached their final destination and place of rest and ceased to be subjects of interstate commerce, and had become incorporated in the general mass of property in this State and liable to be taxed as other property, there being no discrimination made in the ordinance against them as goods from another State, they not being taxed by reason of being brought from another State, but only taxed in the usual way, as other goods are. There was no attempt in the ordinance in question to tax the sale of goods, or the offer to sell them, before they are brought into the State. There was no negotiation of sales of goods which were in another State for the purpose of introducing them into this State.

It will have been observed that in the case we have been quoting from, *Emert* v. *Missouri, supra,* the Supreme Court of the United States is careful to note that while the defendant Emert's occupation was offering for sale and selling sewing machines manufactured and owned in New Jersey, yet that there was nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time ; and that his dealings were neither accompanied nor followed by any transfer of goods, or of any order for their transfer from one State to another. Had it been otherwise, the case would have been ruled by *Brennan* v. *Titusville, supra.* There is no conflict between the two cases, as appellee's counsel seems to suppose. On the contrary, the opinion in the latter case expressly mentions the former as following the rule laid down in *Robbins* v. *Shelby Taxing District, supra,* and as in harmony with the rule laid down in the case then before the court, the conclusion there reached being that the Missouri statute, there involved, was in nowise repugnant to the power of congress to regulate commerce among the several States, but was a valid exercise of the power of the State over persons and business within its borders.

That conclusion is decisive of the question here involved and discussed by counsel on both sides. But appellee's counsel seeks to avoid the force of that conclusion by contending that the facts agreed upon do not bring the present case within that rule, because, as he contends, that: ''The defendant was engaged in the sale of chairs on the installment plan. When a purchaser was found, only a conditional sale was made, the title being retained in the foreign owner until some indefinite time in the future. It might never vest in the purchaser, for the reason that he might never comply with the conditions of the sale.''

And the further contention is that an actual sale is necessary to bring the defendant within the rule laid down in *Emert* v. *Missouri, supra,* by the Supreme Court of the United States. It is a sufficient answer to that contention to say that while that case was one where an actual sale had been made, yet no rule was there laid down that an actual sale was necessary in that or any other case, though the prosecution was for a violation of a statute providing that "No person shall deal as a peddler without a license."

Whether that statute was actually violated or not by Emert was not discussed or decided by the Supreme Court of the United States because that was not a federal question and that court has no jurisdiction on a writ of error to the Supreme Court of a State as was the case there, to decide anything but federal questions. The ordinance here involved, however, was very different from the Missouri statute. The ordinance prohibited hawking and peddling without a license, and under the authorities already cited that forbade the selling and offering to sell. The Missouri statute would probably have been held, by the Supreme Court of that State, had the question been presented, to require actual dealing by a peddler to constitute a violation thereof.

But the learned counsel for the appellee himself speaks of the transactions of his client as shown in the agreed facts as a "sale" and the persons to whom such sales were made as a "purchaser." This is significant. It indicates that the learned counsel, though deeply interested in showing that such transactions were not sales, and that the persons with whom his client had them, were not purchasers, yet with all his learning he could find no word in the English language that would so aptly and tersely express what the acts of his client meant or amounted to, or would so correctly characterize them

as the word "sale;" and no word that would so correctly characterize the persons with whom his client had the transactions, as the word "purchaser."

The circumstance that the sales were on the installment plan, the title being retained in the foreign owner until the terms and conditions of the sale were complied with did not wholly eliminate from the transaction all characteristics of a contract of sale. In an executed contract of sale the thing which is the subject of the contract becomes the property of the buyer the moment, the contract is concluded and without regard to the fact whether the goods be delivered to the buyer or remain in the possession of the seller; whereas in an executory contract of sale the goods remain the property of the seller till the contract is executed. 21 Am. and Eng. Encyc. of Law, 476, and numerous authorities there cited in note 1, among which are: *Straus* v. *Ross*, 25 Ind. 300; *Lester* v. *East*, 49 Ind. 588.

Most of the sales made by commercial travelers or drummers are mere conditional sales, yet no one thinks of denying that they are sales, the title to the property remaining in the seller until the conditions of the sale are fully complied with. And yet those transactions are correctly denominated sales. Where personal property is sold for cash on delivery, the sale is conditional, and the title to the property will not vest in the purchaser until the terms of the sale are complied with. *Lanman* v. *McGregor*, 94 Ind. 301; *Evansville, etc., R. R. Co.* v. *Erwin*, 84 Ind. 457. And yet no one in his senses would think of denying that such a transaction was a sale. If such contention were to prevail, all sales by hawkers and peddlers might escape all restraint by cities by inserting such a provision in the contract.

It is lastly contended that the agreed facts do not show that appellee was guiltly of a violation of the

ordinance because there is no statement therein : "That while so engaged the defendant sold and delivered to one Emma Wright, one rattan rocking chair for the sum of six dollars," as was charged in the complaint. It is true that statement was in the complaint and is not found in the agreed facts and if that were the only charge in the complaint the trial court would have been justified in finding for the defendant.

In addition to the above charge the complaint charges "that the defendant on the 12th day of September, 1894, at the city and county aforesaid, violated sections 24 and 25 of the ordinance (describing it) by carrying on the business of hawking and peddling within the corporate limits of the city of South Bend, by carrying, exposing, offering and crying for sale articles of merchandise, to-wit : Rattan rocking chairs in the public streets of said city without having a license for that purpose."

Among other things the agreed facts are that : "The defendant  *  *  at the time of his arrest and before, was engaged in selling chairs within the corporate limits of the city of South Bend, by going personally from house to house within said city and selling the chairs and delivering the same at the time of sale," etc. He could not be selling chairs without making actual sales, and if he did it by going personally from house to house in said city selling the chairs and delivering the same as he has agreed that he did, then he violated the ordinance in both hawking and peddling.

The necessary conclusion upon authority as well as upon principle is that the ordinance in question is in nowise repugnant to the power of congress to regulate commerce among the several States, but is a valid exercise of the police power of the State, vested by the State statute in the city over persons and business within its borders.

It follows that the finding and decision of the circuit court were contrary to law and the evidence, and that it erred in overruling the motion for a new trial.

The judgment is reversed and the cause remanded, with instructions to sustain the motion for a new trial, and for further proceedings in accordance with this opinion.

Howard, C. J., took no part in this decision.

Judgment reversed.

Note.—The regulation of peddling, as affecting interstate commerce, is considered in a note to *Re Spain* (U. S. C. Ct.), 14 L. R. A. 97.