MIDWESTERN PETROLEUM CORPORATION *v.* STATE BOARD OF TAX COMMISSIONERS ET AL.

[No. 26,280. Filed December 15, 1933. Rehearing denied June 26, 1934.]

*William Henry Harrison, James W. Noel, Hubert Hickam, Alan W. Boyd,* and *Robert D. Armstrong,* for appellant.

*Philip Lutz, Jr.,* Attorney-General, and *Edward Barce* and *Joseph W. Hutchinson,* Assistant Attorneys-General, for appellees.

FANSLER, J.—The appellant, describing itself as a multiple owner of filling stations, engaged in the business of using, selling, and distributing gasoline and other petroleum products (exclusive of other merchandise), filed its complaint below on behalf of itself and others in like situation, seeking an injunction prevent-

ing the enforcement of Chapter 207 of the Acts of 1929, known as the Chain Store Tax Law.

The complaint asserts that such filling stations are not "stores" within the meaning of the word as used in the title of the act, or within the definition of the term as stated in the act, and that the act is not applicable to its business. That if the law is by its terms applicable, it is unconstitutional and void, offending against Section 23 of Article 1, Section 1 of Article X, Section 23 of Article IV, and Section 19 of Article IV of the State Constitution. Facts are alleged at great length, upon which appellant seeks to sustain its position.

A demurrer to the complaint was sustained, the appellant refused to plead further, and this appeal is from the judgment thereupon entered.

The only questions presented by the briefs are upon appellant's contention that the statute does not apply to filling stations, bulk stations, or leased stations, and that if it does apply the act is in violation of Section 23 of Article 1 of the Constitution of Indiana. All other questions must be deemed waived.

The constitutionality of the statute in question was considered by the Supreme Court of the United States in a case arising in the United States District Court for the Southern District of Indiana, and the statute was held not to offend against the 14th Amendment of the Federal Constitution, or Section 23 of Article 1, or Section 1 of Article X of the Constitution of Indiana. *State Board of Tax Commissioners of Indiana* v. *Jackson* (1931), 283 U. S. 527.

As to those who come within the statute, the decision of the Supreme Court of the United States as to its offending against the Federal Constitution is conclusive.

The 14th Amendment prevents the curtailment of the rights of citizens, and Section 23 of Article 1 of the

State Constitution prohibits the enlargement of the rights of some and discrimination against others. So long as all are treated alike, under like circumstances, neither of these provisions is violated. *Hammer* v. *State* (1909), 173 Ind. 199, 89 N. E. 846.

It is the province and duty of this court to interpret and apply the provisions of the Constitution of this State. Where a provision of our Constitution is similar in meaning and application to a provision of the Federal Constitution, it is desirable that there should be no conflict between the decisions of this court and the Supreme Court of the United States upon the subject. A decision of the latter court sustaining the validity of a statute of this state as not offending against the 14th Amendment of the Federal Constitution, is not binding on this court when the statute is attacked as offending against the provisions of the State Constitution having the same effect. But such a decision of that high and respected tribunal is strongly persuasive authority. *Sperry & Hutchinson Co.* v. *State* (1919), 188 Ind. 173, 122 N. E. 584.

The statute provides for an annual license fee of three dollars for a single store; and for two or more stores under single ownership, a fee of ten dollars for each not exceeding five; fifteen dollars for each in excess of five and not exceeding ten; twenty dollars for each in excess of ten and not exceeding twenty; and twenty-five dollars for each store in excess of twenty. It is the graduation of fees, discriminating as it does in favor of single stores and smaller groups and against the larger groups, that appellant attacks as unconstitutional.

The United States Supreme Court decided the Jackson Case upon the theory that the act involved is a revenue measure, and it is said in the opinion that the

theory that the legislation would be justified under the police power was not pressed either in the briefs or at the bar.

The majority of the court were of the opinion that there is a substantial and significant difference between the business and operation of single stores and multiple owned stores, consisting not merely of multiple ownership, but in organization and the type of business transacted, and that these differences are sufficient to sustain the legislative classification for revenue purposes. The minority, and the district court, apparently, were of the opinion that the differences were not "germane to the object and sufficiently substantial to save the classification in each case from being condemned as purely arbitrary or capricious."

The Jackson Case involved a chain of grocery stores. The appellant contends that the difference in method of operation between single and multiple owned grocery stores does not exist in the case of filling stations engaged exclusively in the sale of petroleum products, and that operators of single or multiple stations are in substantially the same situation as to cost of merchandise and cash discounts; that the multiple owner has no advantage in buying skill; that there is no depreciation; that both enjoy prompt turnover; that there is no warehousing advantage with the multiple owner; that competition in selling prices does not exist; that products are advertised by the producer, and single operators receive the same proportionate advantage as multiple operators; that all operators commonly have abundant capital; and that multiple owners have no advantage in management. The allegations of the complaint covering these questions are long, detailed and specific, and have the obvious purpose of negativing the difference between single and multiple store operation described in the majority opinion in the Jackson Case.

The same effort was made in the case of *Louis K. Liggett Co. et al.* v. *Lee, Comptroller, etc.* (1933), 288 U. S. 517, 53 Supreme Court Reporter 481, 484, which involved the constitutionality of a Florida statute. In the majority opinion in the latter case it is said:

"In their endeavor thus to distinguish the earlier case, the appellants stress mere details, but ignore the underlying reason for sustaining the classification there attacked. The decision in the Jackson Case was based, not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store; and that the difference between an integrated and a voluntary chain is fundamental. While incidents of the operation of the one may be quite similar to those found in the other, there is a clear distinction between one owner operating many stores and many owners each operating his own store with a greater or less measure of cooperation voluntarily undertaken. The Legislature may make the distinction the occasion of classification for purposes of taxation. Neither similarity of opportunities and advantages in some aspects, nor the fact that the one kind of store competes with the other, is enough to condemn the discrimination in the taxes imposed."

It cannot be doubted that the differences in practices and advantages between the operation of a single and a chain of stores may vary with the lines of merchandise handled. That the question of the constitutionality of the act as a revenue measure presents many difficulties is evidenced by the division of opinion among the learned Justices in the Jackson Case.

But here it is urged that the legislation can be justified under what Judge Cooley calls "the police or equivalent power." Commentators generally regard this type of legislation as designed and intended to discourage chain stores and encourage and

protect local industry. We agree with this view as to the purpose of the Indiana statute, and will consider the question of its constitutionality upon that basis.

It was said by Chief Justice Fuller, in the case of *United States* v. *E. C. Knight Company* (1895), 156 U. S. 1:

> "'It cannot be denied that the power of a State to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, 'the power to govern men and things within the limits of its dominion,' is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. The relief of the citizens of each State from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the States to deal with, and this court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort and by means of which a tribute can be exacted from the community, is subject to regulation by state legislative power."

And by Mr. Justice McKenna, in the case of *Rast, Tax Collector, etc.,* v. *Van Deman & Lewis Co.* (1916), 240 U. S. 342, 365.

> "But no refinement of reason is necessary to demonstrate the broad power of the legislature over the transactions of men. There are many lawful restrictions upon liberty of contract and business. . . . And it is not required that we should be sure as to the precise reasons for such (legislative) judgment or that we should certainly know them or be convinced of the wisdom of the legislation."

And by Mr. Justice Holmes, in the case of *Central Lumber Company* v. *State of South Dakota* (1912), 226 U. S. 157, 160:

". . . it is urged that to punish selling goods in one place lower than at another in effect is to select the class of dealers that have two places of business for a special liability, and in real fact is a blow aimed at those who have several lumber yards along a line of railroad, in the interest of independent dealers. All competition, it is added, imports an attempt to destroy or prevent the competition of rivals, and there is no difference in principle between the prohibited act and the ordinary efforts of traders at a single place. The premises may be conceded without accepting the conclusion that this is an unconstitutional discrimination. If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. . . . It might have been argued to the legislature with more force than it can be to us that recoupment in one place of losses in another is merely an instance of financial ability to compete. If the legislature thought that that particular manifestation of ability usually came from great corporations whose power it deemed excessive and for that reason did more harm than good in their State, and that there was no other case of frequent occurrence where the same could be said, we cannot review their economics or their facts. . . . But the Supreme Court says that the statute is aimed at preventing the creation of a monopoly by means likely to be employed, and certainly we should read the law as having in view ultimately the benefit of buyers of the goods."

And by Mr. Justice Hughes, in the case of *Chicago, etc., Railroad Company* v. *McGuire* (1911), 219 U. S. 549, 565:

"The legislature, provided it acts within its constitutional authority, is the arbiter of the public policy of the State. While the court, unaided by legislative declaration and applying the principles of the common law, may uphold or condemn con-

tracts in the light of what is conceived to be public policy, its determination as a rule for future action must yield to the legislative will when expressed in accordance with the organic law. . . .

"It (the right to contract) is subject also, in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals and welfare of those subject to its jurisdiction. . . .

"The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy.* Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

It is said by Mr. Justice Holmes, in the case of *Alaska, etc., Co.* v. *Smith* (1921), 255 U. S. 44, 48:

"If Alaska deems it for its welfare to discourage the destruction of herring for manure and to preserve them for food for man or for salmon, and to that end imposes a greater tax upon that part of the plaintiff's industry than upon similar use of other fish or of the offal of salmon, it hardly can be said to be contravening a Constitution that has known protective tariffs for a hundred years."

And again, in *Quong Wing* v. *Kirkendall, Treasurer, etc.* (1912), 223 U. S. 59, 62:

"A State does not deny the equal protection of the laws merely by adjusting its revenue laws and taxing system in such a way as to favor certain industries or forms of industry. Like the United States, although with more restriction and in less degree, a State may carry out a policy, even a policy with which we might disagree. . . . It may make discriminations, if founded on distinctions that we cannot pronounce unreasonable and purely arbitrary, . . . It may favor or discourage the liquor traffic, or trusts. . . . If the State sees fit to encourage steam laundries and discourage hand laundries that is its own affair."

And by Mr. Justice McKenna, in *Rast, Tax Collector, etc.,* v. *Van Deman & Lewis Company* (1916), 240 U. S. 342, 357:

"It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78. It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety. *Chi., Burl. & Quincy R. R.* v. *McGuire,* 219 U. S. 549; *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, 413, 414; *Price* v. *Illinois,* 238 U. S. 446, 452.

"It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury but obstacles to a greater public welfare."

The case of *Levy* v. *State* (1903), 161 Ind. 251, 255, 66 N. E. 742, involved the constitutionality of a statute requiring a transient merchant to pay a license fee. In an opinion upholding the constitutionality of the act, Justice Dowling, speaking for this court, said:

"The general principles by which courts are governed in determining the validity of acts of the legislature are too familiar and well established to require a citation of the cases in which they have been announced or followed. The presumption is

generally in favor of the validity of the statute, and an act will never be stricken down by the courts unless the grounds of its invalidity are clearly apparent. In doubtful cases the statute must be upheld. Where the power to enact a law exists, the legislative discretion concerning the time, the circumstances, and the situation calling for the exercise of such power is not subject to review or control by the courts. Where a power is granted or reserved to the legislature, the grant or reservation carries with it the right to use the necessary means to effect the object of such grant or reservation. The authority of the legislature to determine what things are injurious to the interest and welfare of the public, and what measures are necessary for the safety, comfort, and well-being of the citizens of the State, is extensive and far-reaching and, as has often been said, is incapable of strict definition or limitation. A legislative declaration that an evil exists, or that injury is likely to result to the public from particular trades or occupations unless restrained or regulated by law, is entitled to the highest respect by the courts, and should never be disregarded unless clearly in conflict with some provision of the Constitution."

In the case of *Graffty* v. *City of Rushville* (1886), 107 Ind. 502, 505, 8 N. E. 609, in holding that an ordinance requiring a license fee from peddlers was within the police power of the city, Justice Mitchell, speaking for this court, said:

"One end to be attained was the protection and encouragement of local traders and merchants, who are largely dependent for their patronage on their reputation for integrity and fair dealing, and their social and moral standing in the community; and who by investing their means in providing fixed places of trade, and paying taxes on their merchandise, help to build up and maintain the city in which they reside, and contribute to the support of its schools and other local interests and enterprises. . . .

"The thing to be restrained is the putting of goods, the owners of which may or may not have contributed by way of taxation to the benefit of the

municipality, in competition with the goods of the local merchant, every dollars' worth of whose stock has been subjected to municipal taxation, and who has contributed to the social, education, and financial prosperity of the city."

That this type of merchant was discouraged in England is indicated by a quotation from Jacob's Law Dictionary in the last cited case to the effect that "Hawkers and peddlers, etc., going from town to town or house to house are now to pay a fine and duty to the King."

In the case of the *City of South Bend* v. *Martin* (1895), 142 Ind. 31, 41 N. E. 315, the reasoning in the Graffty Case is referred to with approval.

The power to prevent monopolies and combinations in restraint of trade has never been denied, and it is not necessary in the exercise of that right that the thing declared against will accomplish a complete or immediate monopoly, or that it will immediately restrain trade. It is sufficient if it really tends toward monopoly or restraint. *National Cotton Oil Co.* v. *Texas* (1905), 197 U. S. 115; *United States* v. *E. C. Knight Co.* (1895), 156 U. S. 1.

"Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." *Knight & Jillson Co. et al.* v. *Miller* (1909), 172 Ind. 27, 87 N. E. 723.

"Although the legislature may not arbitrarily declare acts, occupations, or things, which are in fact harmless in themselves, to be injurious to the public, and, in the exercise of the police power, subject them to governmental control, yet, when it does impose conditions and restrictions upon particular acts, occupations, or things, it must be presumed that a sufficient reason or necessity for such legislation existed." *Levy* v. *State, supra; Chesapeake, etc., Co.* v. *Manning* (1902), 186 U. S. 238.

The forceful and lucid language quoted well expresses the settled judicial view that it is within the legisla-

tive power to regulate, license, or discourage business enterprises legitimate in themselves, but tending to affect the welfare of the state or the public as a whole, and that, if any reasonable theory may be found to support the view that an injury or impediment to the public welfare is involved, the constitutionality of the legislation will be sustained notwithstanding there may be cogent arguments supporting the view that no injury is, in fact, to be anticipated, or that there are benefits which may outweigh the injury, or that the legislative policy is unwise. That "it is not within the competency of the courts to arbitrate in such contrariety."

Has the legislature discovered and by this statute attempted to correct or prevent what in its judgment is an evil or an obstacle to a greater public welfare?

The operation of a chain of stores certainly tends toward monopolizing merchandising. It may be said that size alone tends toward monopoly, and that great stores doing a large volume of business, to some extent at least, tend to monopolize business. But these are limited to one location, and at most serve only those who can conveniently travel to that location, while the chain may reach into every community and thus has greater opportunity to reach the entire consumer field.

The statute involved in the case of *Central Lumber Company* v. *State of South Dakota, supra,* declares against selling goods in one place at a price lower than at another; the evil aimed at was the practice by the chain operator of underselling an independent competitor for the purpose of eliminating him. The statute was held constitutional. This same evil might be accomplished without selling cheaper in one community than in another. If a neighborhood store is located in a community where the volume of business is only sufficient to sustain one store, a chain may establish a

store in the community and, by dividing the business with the independent store, create a condition where both are operating at a loss. The chain store's loss may be absorbed by the other links in the chain, and when the independent merchant is forced to quit, the entire volume of business will go to the chain store and make it self-sustaining. The legislature may have believed that the rapid growth and efficient methods of chain operation presages the gradual elimination of the independent merchant, and that each line of mercantile business will ultimately be controlled by a few, a condition generally recognized as inimical to the public welfare. If the state were to stand by and permit the elimination of the independent merchant and the accomplishment of practical monopoly, it might be confronted with great difficulty in finding a remedy. When an effort was made to dissolve a great trust it was said that you "can't unscramble eggs." Once monopoly is accomplished, the restoration of business to the hands of the independent store owner may be practically impossible. If the tendency toward monopoly is present, wisdom may well recommend preventive measures, rather than remedies after the evil is accomplished. It may be that chain operated stores sell merchandise cheaper than independent stores, to the benefit of the public. Conceding this to be true, the question of whether the benefit outweighs the dangers of monopoly and possibly higher ultimate prices, is for the determination of the legislature and not for us.

It may be reasonably urged that the stability of local communities is important to the welfare of the state, and that the small merchant is essential to that stability. He transacts business with local bankers, wholesalers, mechanics, artisans, and farmers. Because of closer association he has a more responsible interest in his employees. He and his employees are commonly

raised in the community and expect to live their lives there and, hence, have an incentive to acquire homes and property. They are in active contact with their kindred and neighbors, and maintain an interest in the affairs of the community that will probably continue to be their homes and the home of their children. Because of their permanent connections they have a greater interest in local, charitable, religious, educational, cultural, and civic affairs, and are imbued with a loyalty to their communities, which impels loyalty to the state and its institutions in a higher degree than would be expected from transients, who must ever anticipate the possibility of change of residence to, perhaps, distant communities or states.

This court has upheld statutes discriminating against the itinerant merchant and peddler in the interest of the local merchant. If protection of the local merchant is a sufficient basis for a policy of discrimination against peddlers and small itinerant merchants, it is difficult to see why it should not afford a sufficient basis for a policy of discrimination against chain store organizations.

Our national protective tariff policy was adopted upon the theory that the public welfare would be advanced by the encouragement of our infant manufacturing industry, and the discouragement of the business of importing goods. The policy was continued upon the theory that protective schedules permit domestic manufacturers to pay higher wages to their employees than are enjoyed by foreign workmen, and that thus the general welfare is promoted by permitting better living conditions and advancing the welfare of factory workers, even at the expense of higher prices for the citizen generally. May it not be as logically said that the public welfare is advanced by discouraging the chain store for the purpose of permitting the small local mer-

chant better living conditions, or in fact the opportunity to live at all in his chosen employment?

Not all have agreed with the wisdom of our tariff policy, or our policy of discriminating against transient merchants and peddlers, but the determination of the policy has been left to the people and their legislative representatives.

It may be inevitable that the chain store will drive the small local merchant out of business. The legislature may have believed that his going will affect the welfare of the state, or its people, or its communities, and that it is desirable and important to the public welfare to protect him, and, with that purpose in view, enacted this legislation. Strong argument may support the contention that the legislative view is erroneous, that the chain store does not endanger the public welfare, that the local merchant is not important to the community or to the welfare of the state, but that the question is debatable is unanswerably established by the constant debate about it. The legislation must be deemed to have been enacted in the furtherance of a policy of protection to and encouragement of the small local merchant and discouragement of chain store organizations, and since the view that the public welfare is involved may be supported by reasonable argument, the adoption of such a policy is within the legislative power.

We conclude that the purpose of the act is one which it is competent for government to effect, and the classification has a reasonable relation to the purpose; the graduation of license fees upward is justified, since the larger the chain the greater is the threatened damage. The act does not offend against the Constitution of Indiana.

Appellant contends that the statute is not applicable, either to filling stations, bulk stations, or so-called

leased stations, operated as described in its complaint. It contends that the meaning of the word "store," used in the title of the act, taken in its plain or ordinary and usual sense, does not include filling stations, and that it is not necessary or proper to resort to definitions in books or dictionaries to determine the meaning of the word. The title of an act will sufficiently conform to the constitutional purpose if it is calculated to fairly give notice and to reasonably lead to an inquiry into the body of the act. Webster's Dictionary defines "store" in the commercial sense as meaning "any place where goods are kept for sale, whether by wholesale or retail; a shop;" and other recognized dictionaries give similar definitions. An opinion of the Supreme Court of Wisconsin is quoted in which it is said that "If one were to stop five hundred well-informed intelligent persons traveling into any city and ask them to stop at the first store or mercantile establishment where goods, wares, or merchandise were sold or offered for sale, it is quite probable that not a single one would stop at a filling station or service station." It is probably equally true that if five hundred persons were asked for a definition of the word store, they would give substantially the dictionary definition above quoted. But such reasoning, it seems to us, is of no avail. If words used in the title of an act are not to be given their ordinary dictionary meaning, we are at a loss to know what construction might be put upon a statute. It should be accepted as the rule that nontechnical words used in the title of an act, or in the act itself, will be construed according to their ordinary and accepted dictionary meaning, unless an intention to convey some other or different meaning can be gathered from the context. The definition of the word store contained in the body of the act conforms almost exactly to the dictionary meaning, thus indicating the

legislative understanding of the word, and it is notable that where similar legislation was enacted in other states where it was desired to exempt filling stations from the operation of the law, they were expressly exempted, which seems to indicate a belief that they would come within the meaning of the word stores if not so expressly exempted.

It is also contended that because the statute uses the words "in which goods, wares and merchandise are sold," and requires a license to be displayed "in" the store, the act was not intended to apply and does not apply to establishments where the business is transacted outside of an enclosure and not under a roof. Webster's Distionary says that the word " 'in' is specifically used as indicating a point or place thought of as spatially surrounded or bounded;" and "in this sense it is used by extension before words only indirectly or vaguely denoting physical surrounding." To interpret the word as indicating a legislative intention that mercantile establishments that are not under a roof or not within an enclosure, should not be subject to the requirements of the act, would be to ignore the plain language of the act in which it is said, "The term 'store' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments."

Appellant urges that the fact that it is subject to a Gasoline Dealers' License Tax, and is required to collect the gasoline tax upon sale of that product, and is subject to the payment of oil inspection fees, is persuasive to the proposition that it will not be included by implication in the terms of the statute, but must be excluded therefrom. But we find no necessity for an inclusion by implication, since it seems to us that it is included by express terms. The fact that its business is confined almost exclusively to dealing in petro-

leum products, is a result of its own choice. It is well known that grocery stores, and others engaged principally in some other line of business, purvey petroleum products, and nothing but free choice prevents appellant from dealing in general merchandise in addition to the business in which it is now engaged.

It asserts that the law does not apply to its bulk stations, which are not stores but merely storage plants or warehouses from which distribution is made for the purpose of supplying appellant's own service stations and making delivery to customers. It is alleged that it maintains an office, and that its wholesale sales are made by telephone or mail or personal contact at this office, which is not situated at the same place as its so-called bulk stations, and that, therefore, no merchandising is done at the bulk places. We cannot take the contention seriously. If it could be sustained, every wholesaler or retailer who transacts business by accepting orders and making deliveries might detach his office from the place where his merchandise is stored and thus exempt himself from the operation of the law.

Appellant owns certain service station equipment which it leases to dealers in various parts of the state. It is alleged that appellant does not sell any merchandise at any of such stations and does not own any of the merchandise kept by such dealers; that the dealers buy most of their petroleum products from appellant, but have the right to buy and deal in products purchased from other sources; that some pay a cash rental for their stations, while others pay no rental except as the same is represented in the price at which the products of appellant are sold; that title to the products passes to the dealer upon sale and delivery, and appellant thereafter has no interest in or control thereof; that no direction is given the dealers as to

price, and appellant exercises no control or supervision over the station, but appellant has reserved the right to cancel any such lease upon written notice a specified number of days in advance; that the only interest of appellant in the stations is an outlet for its merchandise. The purpose of the ownership of the stations is the sale of appellant's products. Some of the dealers pay no rent. It is alleged that they are free to buy from other sources, but it is obvious that if they purchase all or a considerable part of their merchandise from any other source, appellant would cancel the lease since appellant is only benefited by the sale of its products. It is alleged that some of the dealers pay cash rental. To put it another way, some of the dealers look for their compensation to the retail profit of the station, and as compensation receive the entire retail profit, while others are required to pay to appellant part of the retail earnings of the station and retain the balance as their compensation. They are in the same situation as employees working on commission, notwithstanding title to the merchandise handled vests in them upon delivery. They are required to pay the wholesale price, but retain the retail price. To say that these stations in their operation are not under the control of appellant, would be to ignore the plain fact that the operators must obey the every dictate of appellant or lose their contract and station. The act by its terms applies to any "establishment or establishments which are owned, operated, maintained or controlled by the same person, firm or corporation." The so-called leased stores are within the definition.

It is assumed that the service station equipment referred to is substantially all of the essential equipment in the so-called leased stations. If the equipment leased is but incidental to the operation of the station, and the station contains other equip-

ment with which it could operate without appellant's equipment, appellant cannot be considered as controlling the station.

The judgment is affirmed.

## On Petition for Rehearing.

Myers, J.—Upon a reconsideration of the questions involved in the instant case, and the additional authorities cited in support of the petition for a rehearing, I am convinced that a rehearing should be granted, but not for the reason that the law is unconstitutional because of an insufficient title.

The title of the Act in this case questioned expresses the subject of the legislation generally, as will appear from a consideration of the title and the body of the Act. True, the title does not give a complete abstract of the contents of the Act, but such detail is unnecessary. *Baltimore, etc., R. Co.* v. *Town of Whiting* (1903), 161 Ind. 228, 68 N. E. 266; *Wright* v. *House* (1919), 188 Ind. 247, 121 N. E. 433.

Courts will endeavor to discover legislative intention and effectuate the manifest purpose of the statute from a consideration of the legislative language, but they will not be permitted to legislate, nor are they authorized to give the language used an unnatural interpretation.

The prevailing opinion in this case gives considerable space on the power of the legislature to enact laws licensing or taxing multiple stores. I have no fault to find with revenue laws or a taxing system which is designed especially for the reasonable protection of a lawful industry, whether classed as industrial or merchandising. The courts of this country with general unanimity have sustained legislative enactments which tend to encourage legitimate business activities of general public interest against monopolies and war on

reasonable returns which result from a prudent and discrete management. Such was the object of the Anti-Trust law, lately seldom mentioned. What is commonly known as the police power, not yet conclusively defined, is generally considered a power of government reserved to the states for the establishment of such rules and regulations for the conduct of all persons essentially conducive to the public interest or the greater welfare of the state, even though its exercise is not for the suppression of what is offensive, disorderly, or unsanitary.

To my way of thinking, the sole question in this case, under the facts pleaded, is whether appellant is without the legislative definition of the word "store." The majority opinion has chosen to give the word "store," as used in the Act, its dictionary definition instead of the limited meaning given to it by the legislature. The title of the Act relating to stores is general, but in the Act it is specific. In such cases, in the construction of statutes, a specific provision will prevail over a general provision involving the same subject matter. *Straus Brothers Company et al.* v. *Fisher et al.* (1928), 200 Ind. 307, 163 N. E. 225.

In a commercial sense, lexicographers define the word "store" as "any place where goods are kept for sale, whether by wholesale or retail; a shop." Webster. But the legislature was not content to use the broad dictionary definition when defining "store" in what is commonly known as "The Chain Store Act," ch. 207, Acts 1929, p. 693, for, by §8, it specifically states the meaning of the word intended as follows: "The term 'store' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained or controlled by the same person, firm, corporation, co-partnership or association, either domestic or foreign, in which goods, wares or merchandise of any kind, are

sold, either at retail or wholesale." The dictionary definition includes the words "any place," which might well be construed as applying to peanut push-carts and street corner venders, for they are at a place when the sale is made, while the word "store" in the so-called Chain Store Act is construed to mean any store *in which* goods, wares or merchandise of any kind are sold either at retail or wholesale.

It is said if the legislature intended to exclude filling stations along the roadside, or bulk stations, it would have said so, but on the other hand it may as well be said that if it was the legislative intention to include roadside filling stations and bulk stations without naming them, the legislature would have said a store is "any place where goods are kept for sale," thus indicating an intention to adopt the dictionary definition.

The question at bar involves a penal statute, which is given a liberal construction by the majority opinion, contrary to the settled law in this jurisdiction that penal statutes must be strictly construed and nothing will be added by inference or intendment. *VanArsdall* v. *Indiana Bell Tel. Co.* (1926), 84 Ind. App. 257, 151 N. E. 19, and cases there cited.

In my opinion the identical question for our decision was considered and decided adversely to the majority opinion in this case by a three-judge United States District Court for the Southern District of West Virginia, *Standard Oil Co. of New Jersey* v. *Fox, Tax Commissioner* (1934), 6 Fed. Supp. 494. The opinion in that case, in my judgment, rests upon sound legal principles, and I am persuaded to adopt it as controlling of the case at bar.

The petition for rehearing should be granted.