Clark D. Winters, Plaintiff in Error, v. University District Building & Loan Association, Defendant in Error.

Gen. No. 8,642.

Heard in this court at the April term, 1932. ▇▇▇▇ Opinion filed October 17, 1932.

CHARLES TROUP, for plaintiff in error.

LITTLE & FINFROCK, for defendant in error.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an action in trespass on the case for wrongful interference with "contract relations." Plaintiff in error alleges in his declaration that on July 26, 1930, plaintiff, being the owner of certain described real estate in Champaign, Illinois, subject to a mortgage owing by plaintiff in error to defendant in error,

"entered into a written contract with one P. N. Schrumpf, of Greenville, Bond County, Illinois, whereby plaintiff agreed to convey his real estate in Champaign to said Schrumpf subject to a mortgage indebtedness of $9,500 and in consideration thereof, Schrumpf agreed to convey to plaintiff certain farm lands in Bond County, Illinois, subject to a mortgage indebtedness of $1,500, and also agreed to transfer to plaintiff his (Schrumpf's) interest in an agreement for a warranty deed for certain lots in Greenville, Illinois, subject to payments to be made on said agreement after August 1, 1930; that afterwards, during July or August, 1930, Schrumpf and his wife came to Champaign, Illinois, where plaintiff resided, for the purpose of performing said contract and conveying and transferring to plaintiff their property and receiving from plaintiff a conveyance for his property in Champaign; that at all times from the making of said contract until the wrongful interference by defendant as afterwards alleged in the declaration, said Schrumpf was willing and anxious to carry out and perform his part of said contract and to convey and transfer his property to the plaintiff, as provided by the terms of said contract, and to receive a conveyance to himself from plaintiff of plaintiff's property; that defendant, by and through its secretary, well knowing of the contract so made by plaintiff and Schrumpf, wrongfully, intentionally and without just cause or excuse, interfered in said contract relations then existing between plaintiff and said Schrumpf, and by reason and in consequence of defendant's action in knowingly, wrongfully, intentionally and without just cause or excuse interfering with said contract relations between Schrumpf and plaintiff, said Schrumpf was caused to break his contract with plaintiff and caused and induced to fail and refuse to carry out his contract and make the transfers and assignments as

therein provided to be done by him, and to receive a deed from plaintiff to himself for plaintiff's Champaign property according to said contract.

"It was further averred that the property plaintiff would have received from Schrumpf (if it had not been for the defendant's wrongful interference at the time when said contract would have been carried out), was worth $6,000.00 more than plaintiff's property was worth at the time, and by reason of such wrongful interference by defendant, plaintiff lost $6,000.00.

"It was also alleged that plaintiff at all times exercised care and diligence in attempting to dispose of his Champaign property after defendant's wrongful interference, but could not do so, and that defendant instituted foreclosure proceedings to foreclose the mortgage on his property and applied for a receiver, and that the equity in his property was of little or no value."

Defendant in error filed the general issue to the amended declaration and there was a trial by jury.

The exact contract entered into between plaintiff in error and Schrumpf was as follows:

"CONTRACT FOR THE EXCHANGE OF PROPERTY

"This agreement made this twenty-sixth day of July, A. D. 1930, by and between Peter N. Schrumpf and wife of Greenville, Bond county, Illinois, of one part, and Clark D. Winters, of Champaign, Illinois, party of the second part, witnesseth:—

"That the said Clark D. Winters and Peter N. Schrumpf have this day made and herein enter into a contract for an exchange of property, viz.: the said Clark D. Winters agrees to convey to the said Peter N. Schrumpf, lot five (5), block twelve (12) J. R. Scott's Sub-division to the city of Champaign in Champaign County, Illinois, and numbered 203 E Green

street, subject to a balance due on a mortgage to the University Building and Loan Association at Champaign, Illinois, in the original sum of nine thousand five hundred dollars ($9,500) and in consideration thereof, the said Peter N. Schrumpf, agrees to convey his interest in the south twenty-seven fortieth (27–40) of the southwest quarter of the northeast quarter and the north three-fourths (¾) of the northwest quarter of the southeast quarter of section twenty-eight (28), township seven (7) north, range two (2) west of the third principal meridian, Bond county, Illinois, subject to a balance due on a mortgage to Clara Reed Ellis in the principal sum of fifteen hundred dollars ($1,500); also his equity in the agreement for a warranty deed in lots numbers, one, ten and eleven in Rutschman's Addition to the city of Greenville as per plat of said division with one E. R. DeMoulin, which agreement for warranty deed is dated the twenty-first day of May, A. D. 1930 and subject to all payments due on said agreement subsequent to August 1, 1930.

"In witness whereof the parties have hereunto set their hands and seals this twenty-sixth day of July, A. D. 1930.

P. N. SCHRUMPF (Seal)

CLARK D. WINTERS (Seal)"

This contract is somewhat informal in not fixing any time, place or manner of carrying out its terms and provisions. According to the proofs, Schrumpf and his wife came to Champaign three times during the month following the execution of the contract, but plaintiff in error had a severe illness and could not be seen. On the third trip to Champaign, not being able to see plaintiff in error, on someone's suggestion they went to see Burford, secretary of defendant in error. At this time defendant in error held a mortgage upon plaintiff in error's Champaign property, which orig-

inally had been $10,500, but by payments the debt had been reduced to somewhat under $9,500; but plaintiff in error had gotten behind in payments and taxes were unpaid, so that the total indebtedness was above $9,500. There had been some talk of a new loan of $9,500 to help plaintiff in error get straightened around, but nothing definite had been determined.

Just what took place when the Schrumpfs visited Burford is better recited in plaintiff in error's abstracting of their testimony. Mrs. Schrumpf testified as follows: The last time we came up we had a talk with Burford about it and he told us he was afraid we couldn't carry the loan with the family we had, and he told us that property had depreciated in value and he also asked us for double security and wanted us to give bank references and my husband told him we wouldn't give double security for that was something we had never done; he had always taken care of his own business and he wouldn't ask for double security, but the bank references we could give them. Nothing further was said that I remember.

By double security I mean he wanted us to see that the payments were made a year in advance; that's the way we understood it. Suppose building and loan association was going to make mortgage; don't think it was mentioned about Mr. Schrumpf and I making new papers and they would make the loan. Don't remember it being mentioned at all. Not sure about that; don't think that was ever mentioned; just traded equity for equity and we were to take over Mr. Winters' mortgage as he had it. Don't remember just exactly what was the size of the mortgage; don't remember that Mr. Burford said anything about how much we were to pay in dollars and cents each month but Mr. Winters had told us the payments; don't remember that anything was said about $9,500. After that we didn't do anything at all.

Peter Schrumpf testified: Went to the office of the University District Building and Loan Association on that trip. Wife was with me; had conversation with Mr. Burford at that place. We told Mr. Burford at that time we had made this contract to exchange properties with Mr. Winters. He told me that I was a stranger to him and he would want bank references and extra or double security. He would want bank references and double security. He told me he was a little afraid I couldn't make it with so large a family as I had, keeping roomers and that's about all that was said. That is really just about all that was said, only I told him I wouldn't give extra security, that is, if I couldn't trade without that, I wouldn't trade.

In this conversation with Mr. Burford can't remember that we said anything how he was going to make the loans or anything; don't remember distinctly just the language used word for word; don't remember Mr. Burford saying so far as you making the trade was concerned, the building and loan association couldn't prevent it; don't remember that he did say it; if he said it, I don't remember. There wasn't any loan to be made, I don't think. The way I understand it, the property should stand good for it. We were supposed to pay, make monthly payments on a $9,500 loan, I think it was; I ain't sure; don't remember how much we were to pay a month not exactly; was in the neighborhood of a hundred a month, something like that. After this time Mr. Winters was down to my place to see why I didn't come up and trade; that was in the spring of 1931; was planting corn; don't know how long it was after contract was made; probably be eight or nine months after last trip up here. He asked me what was the matter that I didn't come up and I told him I had plumb give it up, I had got disgusted with the deal and had sold this town property during that time. That wasn't all I said to him; told him

just naturally looked too hard for me after I went to the building and loan and seemed like they was going to tie me up and wanted me to give extra security and that was something I wouldn't do and I just went home; didn't tell him in that conversation that I was going to sue him; didn't contemplate bringing suit against him and making him go through with it. After I left the building and loan, I was disgusted with the trade and dropped it; that was the end of it. I never thought any more about it; didn't talk to anybody else besides Burford when I was up here about this trade; did talk to Mr. Winters' brother. He said his brother wasn't able to take care of it. He doubted very much if we could trade. He told us to go see the building and loan what they had to say about it and that is what we done. The reason I didn't press the matter any further wasn't because made up my mind it wasn't a good trade for me,—just made up my mind it was a little too hard for me; wasn't going to give any extra security, anything like that. Before I would do that I wouldn't trade. That was all that kept me from trading. I wasn't going to ask anybody to go my security; didn't feel that it was too big a load to take on; that wasn't reason didn't trade.

Plaintiff in error testified: I lived in 203 East Green Street, Champaign, until September 1, 1931. University District Building & Loan Association held a $10,500 mortgage on property when I went to paying on it. It was taken out in 1927, I think; paid on it up to April, 1930; monthly payments were $113.75; hadn't paid taxes for the year 1930; were other taxes besides those due on it, special assessments. In July, 1930, there was due for taxes about $600. At that time was back on dues from April; there were two payments back. It was in the neighborhood of a month after I came back from Greenville before I got out and tried to do anything; then went down to University

District Building & Loan Association. Mr. Burford
called me and wanted me to come down and I went
down; had a conversation with him. He asked me if I
had done anything in regard to putting this $9,500
loan through and if I had raised the taxes. Previous
to time of making contract with Schrumpf had made
application to the University District Building & Loan
Association to make my loan of $9,500. At time I
made this application owed about $8,500 on old loan,
or along there; wasn't getting difference between that
and $9,500. They told me they would apply that on
keeping up payments on property. They would apply
that on past dues that had not been paid, and also on
future dues up to the 1st of last December. They
would pay it up until then. When I went down to
Building & Loan Association I said something about
was trying to get shut of the property. Mr. Burford
told me, he says, "I blocked that Greenville deal," and
I says, "What was that for?" and he says, "I don't
think you would have been satisfied down there and I
don't think they would have been satisfied here."
Well, I says, "We don't know about that, because we
didn't try it." He says, "I don't think much of prop-
erty in Greenville and neither do I think much of the
land about there." That was about the substance of
that conversation in regard to that; had conversation
with him subsequent to that; last one I had with him
was in April of this year; said he was going to fore-
close; asked if my boys were coming to my rescue. I
says, "no, sir, there is nobody going to help me in this
deal, I am alone," and he says, "we will have to fore-
close." I says, "well, I suppose that is what you will
have to do." Every time I would talk to him that is
what he would tell me. He said, "I am going to tell
you if you trade that property, we have got to approve
of what you get." He says, "we will have to be satis-
fied." He says, "we will not accept any Missouri land

nor southern Illinois land nor Hutsonville property nor any Ohio land''; that the building and loan would not allow me to trade for any of that kind of stuff. That was last conversation I had with him. That was in April; continued to live in that property until 1st of September; suppose it was receiver we surrendered possession to. There was three or four of them talked to me about it; said there was a receiver. After Burford told me he had blocked the deal, Schrumpfs never came up to Champaign again after that.

There was some testimony by plaintiff in error that in July, 1930, the Champaign property was worth about $10,000. Plaintiff in error was permitted to remain in the property until September 1, 1931, when foreclosure was started and a receiver appointed. Plaintiff in error's wife had died in 1927.

Defendant in error offered no proofs. Plaintiff in error never had a deed prepared and presented to Schrumpf and demanded that the contract be carried out.

The court instructed the jury to find a verdict for defendant in error and a verdict and judgment was found and entered against plaintiff in error. Plaintiff in error has assigned error upon this finding.

Plaintiff in error complains because his witness Peter Schrumpf was permitted to testify: ''He said his brother wasn't able to take care of it,'' speaking of a conversation with plaintiff in error's brother. There was no objection to the testimony nor motion to strike it out. It cannot be said in this case that defendant in error was a stranger to the property in question. It had a mortgage upon the property for substantially its entire value and upon this mortgage plaintiff in error had made default, not only in the payments to be made of principal and interest, but in the payment of taxes. Defendant in error assumably could foreclose at any time, as it did foreclose, and upon default and fore-

closure assumably it could have had a receiver appointed and take possession of the property, as it did have a receiver appointed and take possession of the property in September, 1931. Defendant in error may have been willing that plaintiff in error remain upon the property and keep it in possession and under his care while in default in his payments, and yet defendant in error might have been opposed to some third person, Schrumpf or otherwise, to move into the premises, who may not have been fitted, personally or financially, to meet the payments or to manage property of that nature and defendant in error, in what he did and said in regard to the occupancy of the property and the payment of the taxes and mortgage payments, was within his rights. Eliminating all technical defenses in this case, the law applicable to the facts is laid down in *Doremus v. Hennessy,* 62 Ill. App. 391; *Doremus v. Hennessy,* 176 Ill. 608; *London Guarantee & Accident Co. v. Horn,* 206 Ill. 493; *Carpenters' Union v. Citizens Committee to Enforce the Landis Award,* 333 Ill. 225; *Milliken v. Hildebrand,* 234 Ill. App. 276. Not all of these cases are for interference with contracts, but the rule is the same. In *Milliken v. Hildebrand, supra,* the authority is cited:

" 'By the weight of authority, where, as an incident to the exercise of an absolute right by an individual, the breach of a contract between third persons results, no liability attaches by reason thereof to the person exercising such right. On the other hand, if a qualified right is maliciously exercised for the purpose of causing the breach of contract between third persons, and it has this effect, liability for the injury resulting from the breach of contract thus brought about will attach to the person exercising the right. The criterion as to whether a right is absolute or qualified is pointed out in a note in 29 L. R. A. (N. S.) 869.' *Wheeler-Stenzel Co. v. American Window Glass Co.,* 202 Mass. 471, L. R. A. 1915 F 1076 note.

"It appears from the declaration that Hildebrand was not the owner of the land, he simply had a contract for a conveyance from the owners. This contract was subject to assignment, but Milliken did not see fit to take an assignment. He entered into a contract of sale with Hildebrand, which contract did not even refer to the contract between Hildebrand and the owners, and did not make any provision for Hildebrand to carry out his contract with the owners." And in *London Guarantee & Accident Co. v. Horn, supra,* the court, citing (page 504) *Quinn v. Leathem,* App. Cas. of 1901, p. 495, (decided by the House of Lords,) said: "In *Quinn v. Leathem, supra,* it was said: 'It is a violation of legal right to interfere with contractual relations recognized by law if there be no sufficient justification for the interference.' " In the dissenting opinion of Justices Cartwright and Wilkin, in the *Horn* case, upon the facts, they cite *Perkins v. Pendleton,* 90 Me. 166, and quote:

"In *Perkins v. Pendleton,* 90 Me. 258 (decided in 1897), the *Vermont* case, *supra,* was cited for that part of the opinion which says: 'The authorities cited for the plaintiff clearly established that if the defendant, without having any lawful right, or by an act or threat *aliunde* the exercise of a lawful right, had broken up the contract relations between the plaintiff and Libersont maliciously and unlawfully, although such relations could be terminated at the pleasure of either, and the damage had thereby been occasioned, the party damaged could have maintained an action against the defendant therefor.' But it is also said: 'We think that the important question in a case of this kind is as to the nature of the defendant's act and the means adopted by him to accomplish his purpose. Merely to induce another to leave an employment or to discharge an employee by persuasion or argument, however whimsical, unreasonable or absurd, is not, in and of itself, unlawful, and we do not

decide that such interference may become unlawful by reason of the defendant's malicious motives, but simply that to intimidate by threats, if the threats are of such a character as to produce this result, and thereby cause him to discharge an employee whom he desires to retain and would have retained except for such unlawful threats, is an actionable wrong. Nor do we differ from the recent decision of the Vermont court in the case above referred to, which holds that a threat to do what the defendant had a right to do would not be such a one as to make the defendant liable in an action of this kind.' . . . It was held in *Raycroft v. Tayntor*, 68 Vt. 219, that 'if one, in the exercise of a lawful right, threatens to terminate a contract between himself and another unless the latter discharges his employee not engaged for any definite time, the discharged employee has no right of action for damages against the party making the threat, although his motive in procuring the discharge may have been inspired by malice.' In that case the defendant was the manager and superintendent of a granite quarry. One Libersont obtained from him leave to go into the quarry and cut the poorer granite into paving stones by paying an agreed price therefor. The contract was for no definite time. He expected to continue the work through the winter. The plaintiff was employed by the latter in the work of cutting the paving stones. While so employed a disagreement arose between him and the defendant about matters having no connection with the quarry or his employment by Libersont. The defendant becoming angry, ordered the plaintiff to leave the premises and threatened to have him discharged. He afterwards went to Libersont and told him that if he did not discharge the plaintiff he could no longer cut paving blocks on the premises. Libersont informed him of his arrangement with the plaintiff; that he was satisfactory to him and he did not

want to discharge him, but the defendant insisted that he must be discharged or that Libersont should leave the works, and thereupon the latter did discharge him solely because of that demand. The plaintiff showed that he suffered loss by reason of such discharge and recovered a judgment in the trial court, but the Supreme Court reversed it on the ground that the defendant's demand for the plaintiff's discharge was but a threat to exercise a legal right,—that is, the right to terminate his agreement with Libersont whenever he chose to do so. That decision seems to be supported by the authorities referred to in the opinion, and none are cited or to be found to the contrary."

The "gist" of all these cases is that defendant in error has the right to look after all of its interests in the property in question and protect its rights willfully and conclusively, and if defendant in error, while engaged lawfully and legally within its legal rights, even with malice interferes with the contracts and combinations of others, it is not actionable.

Again quoting from the *Horn* case (206 Ill. 493, 510): "On that subject Mr. Justice Cooley says: 'Bad motive, by itself, then, is no tort. Malicious motives make a bad act worse, but they cannot make that a wrong which in its own essence is lawful.' He illustrates the rule by the case of *Mahan v. Brown*, 13 Wend. 261, and then says: 'So it has been held that no action would lie for maliciously conspiring, as insurance officers to refuse insurance on the plaintiff's property; or for maliciously collecting the notes of a bank and presenting them for redemption; or for maliciously adopting a trade-mark to the prejudice of a plaintiff who has no exclusive right to appropriate it; or for throwing open one's land to the public so that they may pass over it, thereby avoiding a toll gate; or for maliciously throwing down fences put up through one's land to mark the lines of a road which has never

lawfully been laid out.' (Cooley on Torts, 690.) One may sue his debtor from no motive but ill-will, and yet if there is a legal cause of action there could be no liability for bringing the suit. It will be manifest from these examples that immunity from liability for the exercise of a legal right does not rest alone upon the right of competition in trade, but is founded upon the truism 'that the exercise by one man of his legal right cannot be a legal wrong to another.' (Cooley on Torts, 688.) To justify a recovery there must be a legal wrong as well as damage."

Taking all of the facts of this case into consideration, defendant in error was absolutely within its legal rights in discouraging Schrumpf from trading for the property. Plaintiff in error had no interest in the property, or so little it could be used only as a decoy for the unwary. Defendant in error did not have to stand by and suffer anyone to be "fleeced" whom it knew it would not permit to enter into possession. In all the proofs we do not find that defendant in error did anything it did not have a legal and lawful right to do, and the circuit court of Champaign county did not err in instructing the jury to find a verdict for defendant in error and entering judgment. Accordingly, the judgment is affirmed.

*Affirmed.*