## BISSELL CARPET SWEEPER COMPANY v. SHANE COMPANY, INC.

[No. 29,327. Filed May 22, 1957. Rehearing denied September 17, 1957.]

*Bernard Landman, Jr., Charles B. Feibleman, Bamberger & Feibleman* (of counsel), all of Indianapolis, for appellant.

*Rochford, Blackwell & Rochford,* of Indianapolis, for appellee.

*Richard S. Melvin,* of Gary, *Thomas A. Rothwell,* of Chicago, Illinois (of counsel), for American Fair Trade Council, Inc., Hamilton Manufacturing Corp., Indiana Retail Hardware Assn., South Bend Bait Company, The Anderson Company, The Magnavox Company and The Pinex Company, Inc., as *Amici Curiae.*

*R. Stanley Lawton, Wesley A. Dierberger, Alan H. Lobley* and *Ross, McCord, Ice & Miller* (of counsel), all of Indianapolis, for General Electric Company, *Amicus Curiae.*

Appellant, a Michigan corporation, alleged by its complaint it manufactured carpet sweepers, which had thereon its trade-mark "Bissell Carpet Sweeper Company," which were sold in open competition in Indiana "with merchandise in the same general class produced by others"; that appellee was engaged in the retail business in the city of Indianapolis; that appellant had entered into voluntary contracts with certain retailers including H. P. Wasson & Co., pursuant to the Indiana Fair Trade Act which established minimum prices for its carpet sweepers throughout the state; that the appellee did not execute any "such contract to establish such minimum resale prices," but that prior to the filing of the complaint appellant gave written notice to the appellee that such contracts were in existence, but that appellee wilfully and knowingly offered for sale and did sell the carpet sweepers at less than the minimum prices established by appellant's contract, and that the sale did not come within any of the exceptions provided for in §5 of the Fair Trade Act.

The demurrer for want of facts questioned the constitutional powers of the General Assembly to prohibit the appellee from selling Bissell Carpet Sweepers at less than the price established by the appellant with its contract retailers.

The Fair Trade Act, ch. 17 of the 1937 Acts (§66-301 to §66-309, Burns' 1951 Replacement), is limited to commodities using a trade-mark, brand or name, of a producer or distributor, and sold in free and open competition with commodities of the same general class produced or distributed by others. Section 66-302, Burns' 1951 Replacement, declares valid contracts between a seller and a buyer, or a series of contracts between successive sellers and buyers for sale at wholesale or retail, requiring the ultimate retailer to contract not to sell the commodities at less than the fair trade price established by the original seller. A could sell to B with B contracting he would not sell at retail below the price fixed by A, or with B contracting that if he sold to retailer C he would require of C a contract not to sell at retail below the price fixed by A, or if C sold to D for resale, he would require of D a similar provision for the benefit of A, who would fix the minimum retail price. Thus, the fair trade price required of the ultimate retailer could be established by contract, or a series of subsequent contracts for the benefit of the first seller establishing the fair trade price. The ultimate retailer would be bound because of his contract, and not because a statute said he should be bound when he did not consent.

The price fixing authorized by this section is somewhat similar to the factual situation in *Dr. Miles Medical Co.* v. *Park & Sons Co.* (1911), 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502. The Court, in an opinion by

Mr. Justice Hughes, summarized the contracts by saying they provided "a system of interlocking restrictions by which the complainant seeks to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or sub-purchasers, and thus to fix the amount which the consumer shall pay, eliminating all competition." (220 U. S. at 399.) The Court held the contracts were an invalid restraint of trade both at common law and under the Sherman Anti-Trust Act of July 2, 1890.

It is within the power of the General Assembly to change the common law rule in Indiana, and to except fair trade price fixing by contracts between buyers and sellers from the various provisions of the restraint of trade acts of this state.

The Miller-Tydings Act of 1937 (15 U. S. C. A. §1) amended the Sherman Anti-Trust Act and the Federal Trade Commission Act to make lawful price fixing contracts in interstate commerce if they were lawful in intrastate commerce. In *Schwegmann Bros.* v. *Calvert Distillers Corp.* (1951), 341 U. S. 384, 71 S. Ct. 745, 95 L. Ed. 1035, it was held price fixing by compulsion was not validated by the Act. The Court clearly noted the distinction by the following language:

> ". . . If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement;

that is resort to coercion." (341 U. S. at 388, 95 L. Ed. at 1045.)[1]

The appellant Bissell bases its cause of action on §6 of the Fair Trade Act, which states:

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this act [§§66-301— 66-309], whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby." Section 66-306, Burns' 1951 Replacement [Acts 1937, ch. 17, §6, p. 53].

The complaint specifically alleges the appellee Shane was not a party to any contract to fix the retail price. It fails to allege from whom Shane purchased the sweepers or when they were purchased. For all that was alleged, Shane could have purchased them in Michigan where fair trade price fixing is illegal. *Shakespeare Co.* v. *Lippman's Tool Shop Sporting Goods Co.* (1952), 334 Mich. 109, 54 N. W. 2d 268; *Argus Cameras* v. *Distributors* (1955), 343 Mich. 54, 72 N. W. 2d 152. Appellant's position is that wilfully and knowingly selling and offering for sale Bissell's sweepers at prices less than fixed by Bissell after notice of the contracts

---

1. The McGuire Act of 1952 (15 U. S. C. A., §45, 1956 Supp.) made lawful in interstate commerce state fair trade price fixing imposed by state law on persons not parties to a contract if the restriction be valid under state law. See Resale Price Maintenance by Carl H. Fulda (1954), 21 U. of Chicago Law Rev. 175-211. For review of state decisions see Bates, Constitutionality of State Fair Trade Acts (1957), 32 Ind. L. J. 1, 127-149.

to which Shane was not a party entitled Bissell to relief.[2]

We are not at liberty to substitute our judgment for that of the General Assembly as to whether price fixing is good or bad for the economic life of the state. Conceivably, in a time of depression the benefits might outweigh the disadvantages, while the converse may be true in a time of prosperity or inflation. But the Indiana Constitution on separation of powers and the vesting of the right to enact laws in the General Assembly have the same meaning whatever may be the business or economic conditions of the State.

The right to fix a utility rate, which is price fixing for the service, is a legislative act. *State ex rel. Evansville etc. Lines* v. *Rawlings* (1951), 229 Ind. 552, 99 N. E. 2d 597, and authorities therein cited. After the Legislature has enacted that the rates be just and reasonable, it can delegate to an administrative commission the duty of finding as a fact what charge would be just and reasonable, but the commission does not make a law. The law operates on the facts found by the commission under proper standards and after a hearing. The rate is legislative in character because it makes a rule for the future, and binds both the utility and the users of its services whether they consent or not. *Prentis* v. *Atlantic Coast Line Co.* (1908), 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150; *Chicago, etc. R. Co.* v. *Railroad Comm.* (1911), 175 Ind. 630, 643, 95 N. E. 364; *In re Northwestern Indiana Tel. Co.* (1930),

2. The contract signed by H. P. Wasson & Co. provided: "We will not sell sweepers bearing Bissell's trade-marked model names at less than the applicable Fair Trade minimum retail prices at the time of such sales. (See other side for present price list. Such Fair Trade minimum retail prices are subject to change by Bissell at its election.) (This paragraph does not apply any place where Fair Trade agreements are not permitted by law.)

201 Ind. 667, 684, 171 N. E. 65. Both the Legislature and the commission exercise a sovereign power of government.

A fortiori, §66-306, Burns' 1951 Replacement, is broad enough to vest a legislative power to fix prices in private persons. But the Constitution says "The Legislative authority of the State shall be vested in the General Assembly . . ." Article 4, Section 1. The power to legislate or to exercise a legislative function cannot be delegated to a non-governmental agency or person. *Tucker* v. *State* (1941), 218 Ind. 614, 697, 698, 35 N. E. 2d 270.[3] Nor can the Legislature delegate its law-making power to a governmental officer, board, bureau or commission. *Langenberg* v. *Decker* (1892), 131 Ind. 471, 479, 31 N. E. 190, 16 L. R. A. 108; *Blue* v. *Beach* (1900), 155 Ind. 121, 133, 56 N. E. 89, 50 L. R. A. 64; *Sarlls, Clerk* v. *State ex rel. Trimble* (1929), 201 Ind. 88, 110, 166 N. E. 270, 67 A. L. R. 718; *Edwards* v. *Housing Authority of City of Muncie* (1939), 215 Ind. 330, 339, 19 N. E. 2d 741; *Financial Aid Corp.* v. *Wallace* (1939), 216 Ind. 114, 120, 23 N. E. 2d 472; *Hollingsworth* v. *State Board of Barber Examiners* (1940), 217 Ind. 373, 377, 28 N. E. 2d 64; *Town of Kirklin* v. *Everman* (1940), 217 Ind. 683, 693, 29 N. E. 2d 206. We are not concerned with a statute which places upon an official a duty to execute a law made by the Legislature, or where the law fixes a reasonable and fair rate, price or charge and delegates to a governmental agency the power to find as a fact what is reasonable and fair

3. ". . . but it is unthinkable that the Legislature may have discretion to vest a part of the sovereign power in some agency outside the government, as set up and established by the Constitution." *Tucker* v. *State* (1941), 218 Ind. 614, 697, 35 N. E. 2d 270.

under proper standards. See *Albert* v. *Milk Control Board of Ind.* (1936), 210 Ind. 283, 300, 200 N. E. 688.

Section 66-306, Burns' 1951 Replacement, goes far beyond the codes of fair competition authorized by the National Industrial Act of 1933 (15 U. S. C. 703). In *Schechter Corp.* v. *United States* (1935), 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, a Code of Fair Competition for the Live Poultry Industry in the Metropolitan Area of New York was held unconstitutional because Congress could not abdicate its lawmaking power to a trade association or to the President. No standards were prescribed for any trade, industry or activity. It laid down no rules for administrative fact finding. Mr. Justice Cardozo noted this was "delegation running riot." Section 6 of the Fair Trade Act has no requirement for any governmental action by any public officer to establish a coercive price binding on any seller covered by the act.

The decision in *Old Dearborn Co.* v. *Seagram Corp.* (1936), 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476, has been cited in other states for the proposition that fair trade acts do not attempt legislative price fixing by private persons. Section 1 of the Illinois Act was similar to §2 of the Indiana Act and authorized parties to contract for vertical price fixing from the original seller to the ultimate retailer. Concerning this part of the Illinois Act the court said:

"... It is clear that this section does not attempt to fix prices, nor does it delegate such power to private persons. It *permits* the designated private persons to contract with respect thereto. It contains no element of compulsion but simply legalizes their acts, leaving them free to enter into the authorized contract or not as they may see fit. Thus

far, the act plainly is not open to objection; and none seems to be made." (299 U. S. at 192.)[4]

In the Dearborn Case, *supra,* the court carefully excluded any determination of the validity of the Illinois statute under the Fourteenth Amendment in a case where the retailer purchased the goods in ignorance of the fair trade contract.[5] From an examination of the facts as stated in this opinion, and the opinion by the Supreme Court of Illinois in *Seagram Corp.* v. *Old Dearborn Co.* (1936), 363 Ill. 610, 2 N. E. 2d 940, the retailer, the Old Dearborn Co., purchased the whiskey from a wholesaler knowing the wholesaler was required

---

4. The court recognized the general rule the owner of property has the right to sell it at a price he will accept.

"*First.* In respect of the due process of law clause, it is contended that the statute is a price-fixing law, which has the effect of denying to the owner of property the right to determine for himself the price at which he will sell. Appellants invoke the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth Amendments. *Tyson & Brother* v. *Banton,* 273 U. S. 418, 429; *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 537; *Ribnik* v. *McBride,* 277 U. S. 350; *Williams* v. *Standard Oil Co.,* 278 U. S. 235; *New State Ice Co.* v. *Liebmann,* 285 U. S. 262. These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them. But the decisions referred to deal only with legislative price fixing. They constitute no authority for holding that prices in respect of 'identified' goods may not be fixed under legislative leave by contract between the parties. The Illinois Fair Trade Act does not infringe the doctrine of these cases." *Old Dearborn Co.* v. *Seagram Corp.* (1936), 299 U. S. 183, 191, 192, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476.

5. "We are not called upon to determine the case of one who has made his purchase in ignorance of the contractual restriction upon the selling price. . . ." *Old Dearborn Co.* v. *Seagram Corp.* (1936), 299 U. S. 183, 193, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476.

to obtain fair trade contracts for its sales to retailers.[6] The Supreme Court said, "Here, the restriction, already imposed with the knowledge of appellants, ran with the acquisition and conditioned it." (299 U. S. at 194.) Although the opinion did not take note of it, the Old Dearborn Co. in fact was committing a tort by inducing a breach of a distributor's contract to Seagram Corp.[7] 4 Restatement, Torts §766. See also Prosser, Handbook of the Law of Torts (1941), Ch. 20, §104.

It is within the power of the Legislature to declare such inducement to breach a contract unfair competition and actionable. In so far as §66-306, Burns' 1951 Replacement, authorizes this, it is constitutional. The duty breached was not one created by the legislative act of two parties to a contract fixing a price binding upon every retailer of the goods whether or not he knew he was inducing a breach of the contract, or whether or not he purchased the goods from one under no contract obligation to require a fair trade contract from the retailer. Under the particular facts in the Old Dearborn Co. case the court held the Old Dearborn Co. could not complain that the Fourteenth Amendment prohibited the injunction against it.

But in the appeal at bar the complaint and the contracts fail to show anything more than attempted

---

6. The contracts between Seagram and its distributors provided: "Third. Distributor will require from each Retailer to whom he may sell any such beverages a written agreement, upon forms furnished by the Owner [Seagram], that such Retailer in turn will not resell, advertise, or offer for sale the said beverages below minimum prices stipulated from time to time by Owner for resale thereof to Consumers." Printed Record, Sup. Ct. of U. S., pp. 18-19.

7. "Appellant was also a party to breaches of other fair trade contracts between appellee and certain distributors. . . ." *Ibid,* 299 U. S. 187.

legislative price fixing by a contract between the manufacturer and various retailers in the State of Indiana, with no allegation that the appellee Shane ever entered into a contract to sell the sweepers at fair trade prices, or that it induced the breach of contract between Bissell and another party, or that Shane did not acquire the goods in some state, such as Michigan, where such fair trade contracts are held in restraint of trade and void. The complaint rests upon the naked proposition that private parties by contract can make a law binding upon everyone who retails the goods manufactured by Bissell. It is urged that the Fair Trade Act does no more than give an additional property right in a trade-mark. But if this is to be done, it must be accomplished pursuant to the Indiana Constitution. The General Assembly has no right to abdicate its legislative power to private persons, nor could it even delegate to a governmental agency the power to find what might be a reasonable price without proper safeguards and procedural due process.[8]

It is not necessary here to decide what might be proper subjects for legislative price fixing under the Indiana Constitution. And in view of the reasoning of this opinion, it becomes unnecessary to determine whether the construction of §6 of the Fair Trade Act

---

8. "The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,'—essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard.'" Chief Justice Hughes in *Morgan* v. *United States* (1938), 304 U. S. 1, 14, 15, 58 S. Ct. 773, 775, 82 L. Ed. 1129, 1130, 1131.

(§66-306, Burns' 1951 Replacement) urged by Bissell would be without the title of the Act,[9] and therefore void under §19 of Article 4 of the Indiana Constituton.[10]

By the Fair Trade Act, the General Assembly has removed the ban of the common law, as well as the acts concerning restraints of trade and monopolies ■ which prohibited vertical price fixing by agreements or contract between buyers and sellers, but he who seeks to take advantage of the Fair Trade Act will have to base his action on a breach of his contract, or a breach of contract made for his benefit, or on a tortious inducement of a breach of such a contract. This the complaint did not do, and the demurrer was properly sustained.

Judgment affirmed.

Bobbitt, J., concurs specially with separate opinion in which Achor, C. J., and Arterburn, J., concur.

Landis, J., dissents with opinion.

### CONCURRING OPINION

BOBBITT, J.—I concur in the result of Judge Emmert's opinion and with his reasoning as it pertains to the fixing of prices by contract between buyers and sellers who are parties to such contracts.

However, I do not concur in his reasoning pertain-

---

9. The title is: "An act to protect trade-mark owners, producers, distributors and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade-mark, brand or name, through the use of voluntary contracts establishing minimum resale prices and providing for refusal to sell unless such minimum resale prices are observed."

10. ". . . But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title." Section 19, Art. 4, Constitution of Indiana.

ing to certain provisions of Section 6 of the Fair Trade Act.

The following statement appears in Judge Emmert's opinion:

"The General Assembly has no right to abdicate its legislative power to private persons, nor could it even delegate to a governmental agency the power to find what might be a reasonable price without proper safeguards and procedural due process."

I do not want to be understood as concurring in, or lending any support to, the inference which must, in my opinion, necessarily be drawn from this language, that the Legislature has the power to delegate to a State Agency, Board or Commission the authority to fix the price of carpet sweepers or any other commodity of trade or commerce on the open market.

In my opinion the Legislature does not have the power to fix the price at which carpet sweepers may be sold in Indiana, and it must follow that it cannot lawfully delegate such authority to a governmental agency, even with proper "safeguards and procedural due process." *Dept. of Financial Institutions* v. *Holt, etc.* (1952), 231 Ind. 293, 303-304, 108 N. E. 2d 629.

It is, of course, true, as stated in the opinion, that the fixing of a utility rate is a legislative act; and that the Legislature can, and does, delegate to an administrative commission the authority to fix public utility rates within the bounds of certain standards set by the Legislature. However, it does not follow that the source of such power also furnishes the authority to fix standards for, and delegate to, an administrative commission the authority to fix prices for general commodities of trade and commerce.

The Legislature derives its power to fix and regulate

utility rates from the fact that such businesses are affected with a public interest and their property is devoted to public use. Such power is inherent in the State and is an attribute of sovereignty, having its origin in the police power.

The supervision and regulation of public utilities by the Legislature is designed to supply the missing element of competition which protects the public from excessive charges in competitive businesses. *Public Service Commission* v. *Indiana Bell Telephone Co.* (1955), 235 Ind. 1, 130 N. E. 2d 467, 481. Such reason for supervision and regulation (price fixing) is not present where there is open competition in a business such as the manufacture and sale of carpet sweepers.

The right of an individual to engage in a lawful business and to fix the price at which he disposes of his own property is a part of his inalienable right to "liberty and the pursuit of happiness," and is guaranteed by both our State and Federal Constitutions.[1]

The lack of constitutional power of the Legislature to fix prices by law or delegate such power must be, in this case, distinguished from the right of the Legislature to broaden the contracting powers of individuals and corporations, thus permitting them to enter into multiple agreements to fix prices. At common law such contracts were against public policy because they were considered monopolistic and in restraint of trade. The Legislature determines the public policy of the State, and in the exercise of this power it may, by statute, modify or change the rule at common law and enlarge the scope of contractual powers of individuals and corporations.

---

1. See Vol. 32, No. 2, p. 127, Ind. L. J. (1957), for a comprehensive discussion of the Constitutionality of State Fair Trade Acts.

I would affirm the judgment of the trial court.

Achor, C. J., and Arterburn, J., concur.

## DISSENTING OPINION

LANDIS, J.—I cannot agree with the opinion of the court written by Emmert, J., which holds the Fair Trade Law of Indiana is an unconstitutional delegation of legislative power and an infringement of due process in violation of Article 4, §1 and Article 1, §12 of the Indiana Constitution.

The opinion, in my view, means that we have one theory of separation of powers and due process under the Federal Constitution and a different and distinct doctrine of separation of powers and due process under the Indiana Constitution.

The language employed in the two constitutional documents is identical for our purposes, the Constitutions of the United States and of Indiana providing respectively as to the separation of legislative powers: "All legislative *powers* . . . shall be vested in a congress,"[1] and "The Legislative *authority* . . . shall be vested in the General Assembly."[2 and 3] (Emphasis added.) Similarly, the expressions "due process of law" under the U. S. Constitution[4] and "due course of law" under the Indiana Constitution[5] have been considered of like import and used interchangeably.[6]

---

1. Article 1, §1 of Constitution of the United States.

2. Article 4, §1 of Constitution of Indiana.

3. There is no distinction between the words "power" and "authority," and the two constitutional provisions for our purposes here are entirely synonymous. Webster's New International Dictionary (Second Edition) Unabridged, p. 1936, defines "power" as follows: "*Law*. In general, authority, capacity, or right; . . . esp., authority or right to do or forbear derived by one person from another . . . ."

4. Fifth and Fourteenth Amendments, Constitution of the United States.

5. Article 1, §12, Constitution of Indiana.

6. See: *Albert* v. *Milk Control Board of Ind.* (1936), 210 Ind. 283, 200 N. E. 688.

To consider the authorities cited in the opinion of the court, we note the court first places reliance on the 1911 decision of *Dr. Miles Medical Co.* v. *Park & Sons Co.* (1911), 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502, which held the restrictive contracts there involved to be an illegal restraint of trade under the common law and the Sherman Anti-Trust Act of 1890. Everyone concedes the early conflict between Fair Trade and restraint of trade, and similarly everyone now concedes that such conflict was removed by the Miller-Tydings Act of 1937[7] (at least as to contract-signers) as to matters in interstate commerce. The Indiana Fair Trade Act of 1937[8] similarly amended the Indiana Anti-Trust Act of 1897[9] so as to remove the conflict with restraint of trade within the state.

Any application of the Dr. Miles case, *supra,* to the case before us has therefore been removed by statute.

The next case relied upon in the opinion of the court has similarly been rendered ineffective and inapplicable by a subsequent statute. It is *Schwegmann Bros.* v. *Calvert Corp.* (1951), 341 U. S. 384, 71 S. Ct. 745, 95 L. Ed. 1035 (hereinafter referred to as the first Schwegmann case), which decided that Fair Trade contracts with non-signer provisions were in violation of federal anti-trust laws, since the Miller-Tydings Act of 1937 providing exemption from anti-trust laws did not apply to non-signer contract provisions. This statutory deficiency of the Miller-Tydings Act was shortly afterwards remedied by the McGuire Act of 1952[10]

7. 15 U. S. C. A., §1.
8. Burns' Indiana Statutes, §66-301 et seq., 1951 Replacement, being Acts 1937, ch. 17, §§1-10.
9. Burns' Indiana Statutes, §23-101, 1950 Replacement, being Acts of 1897, ch. 104, §1, p. 159, et seq.
10. 15 U. S. C. A., §45, 1956 Supplement.

specifically exempting Fair Trade agreements from federal anti-trust laws as to both signers and non-signers, and the opinion of the court in the case at bar concedes this in a footnote.[11] In considering the first Schwegmann case, *supra*, it should also be noted that such case did not specifically discuss any constitutional questions.[12]

The unquestioned landmark case in the federal courts on the constitutionality of the Fair Trade is *Old Dearborn Co. v. Seagram Corp.* (1936), 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476, which involved the Fair Trade Act of Illinois.

In that case appellee Seagram, a Delaware corporation, was a wholesale dealer in alcoholic beverages in Illinois. Appellant operated four retail liquor stores in Chicago, *but did not purchase any of the whiskey in controversy from appellee.* Appellant's charter powers included sales at both wholesale and retail.

In the Old Dearborn case the challenge was directed against §2 of the Illinois act which provided that wilfully and knowingly advertising, offering for sale, and selling any commodity at less than stipulated in any contract made under the act, *whether the person doing so is or is not a party to the contract,* shall constitute unfair competition, giving rise to a right of action in favor of anyone damaged thereby. In Old Dearborn there was no contractual liability shown on the part of appellant, and the U. S. Supreme Court in a unani-

---

11. See footnote 1 of opinion of the court in case at bar.

12. See: Circuit Court of Appeals opinion to this effect in: *Schwegmann Bros. Giant Super Mkts.* v. *Eli Lilly & Co.* (1953), C. A. 5th Cir., 205 F. 2d 788, (cert. den.) 346 U. S. 856, 74 S. Ct. 71, 98 L. Ed. 369, (reh. den.) 346 U. S. 905, 74 S. Ct. 217, 98 L. Ed. 404 (hereinafter referred to as the second Schwegmann case).

mous opinion by Mr. Justice Sutherland upheld the constitutionality of the Illinois Fair Trade Act, as against the contentions that the Act violated due process and was an unlawful delegation of legislative power.

The majority opinion in the case before us attempts to distinguish the facts of Old Dearborn from the case at bar.

The evidence in Old Dearborn indicated the Old Dearborn Company purchased some of the whiskey in controversy from persons under Fair Trade contract with others, and also purchased whiskey from persons not signatories to such contracts.[13] Any attempted distinction from the case at bar on this point is inconclusive as it did not appear in the case before us, where appellee Shane obtained the merchandise in question.

The observation of the majority in the case before us that, although the U. S. Supreme Court "did not take note of it," Old Dearborn in fact "was committing a tort by inducing a breach of a distributor's contract to Seagram Corporation" is an attempted limitation of Old Dearborn upon a basis that did not sufficiently impress the U. S. Supreme Court for it to express itself on the subject. Not only did Old Dearborn procure whiskey from contract signers and non-signers, so as to preclude any possibility of an induced breach of contract as to the latter, but even as to the former we cannot arbitrarily say there was a tort committed by Old Dearborn. Before we can conclude *ex parte* that Old Dearborn committed torts in inducing breaches of contract not at issue in that case, we should note that there are many situations where a defendant may be

13. See: Printed Abstract of Record, U. S. Supreme Court, Vol. 7, Part 1, pp. 51, 52.

legally privileged to induce a breach of contract and thus not be answerable in tort.[14]

The majority's attempted limitation of Old Dearborn to cases of contractual liability or inducing a tort is a strained construction of the case and entirely unwarranted.

The N. R. A. Schechter case[15] relied on in the majority opinion, and decided by the U. S. Supreme Court prior to the Old Dearborn, did not involve Fair Trade and is inapplicable to the question of delegation of powers under the facts before us in this case.

The next case in the federal courts involving Fair Trade after Old Dearborn is *Schwegmann Bros.* v. *Calvert Corp., supra* (the first Schwegmann case), which has been previously treated. It was superseded by the McGuire Act passed in 1952 (excepting Fair Trade agreements from federal anti-trust laws as to both signers and non-signers), and thereafter the sec-

---

14. For example, if a defendant has a present, existing economic interest to protect, such as the ownership or condition of property, or a prior contract of his own, or a financial interest in the affairs of the person persuaded, he is privileged to prevent performance of the contract of another which threatens it. See: *Diver* v. *Miller* (1929), 4 W. W. Harr., 34 Del. 207, 148 A. 291; *O'Brien* v. *Western Union Telegraph Co.* (1911), 62 Wash. 598, 114 P. 441; *Winters* v. *University Dist. Bldg. & Loan Assn.* (1932), 268 Ill. App. 147; *Meason* v. *Ralston Purina Co.* (1940), 56 Ariz. 291, 107 P. 2d 224; *W. T. B. & T. Soc., Aplnt.* v. *Dougherty et al.* (1940), 337 Pa. 286, 11 A. 2d 147; *Owen* v. *Williams* (1948), 322 Mass. 356, 77 N. E. 2d 318, 9 A. L. R. 2d 223; *Tidal Western Oil Corporation* v. *Shackelford* (1927), Tex. Civ. App., 297 S. W. 279; *Williams* v. *Adams* (1937), 250 App. Div. 603, 295 N. Y. S. 86, 275 N. Y. 653; *Quinlivan* v. *Brown Oil Co. et al.* (1934), 96 Mont. 147, 29 P. 2d 374; *Millers Mut. Cas. Co.* v. *Ins. Ex. Bldg. Corp. et al.* (1920), 218 Ill. App. 12; *White Marble Lime Co.* v. *Lumber Co.* (1919), 205 Mich. 634, 172 N. W. 603; *Ford* v. *C. E. Wilson & Co.* (1942), C. A. 2d Cir., 129 F. 2d 614; *Knapp* v. *Penfield* (1932), 143 Misc. 132, 256 N. Y. S. 41; *Aalfo Co.* v. *Kinney* (1929), 105 N. J. L. 345, 144 A. 715; *Petit* v. *Cuneo* (1937), 290 Ill. App. 16, 7 N. E. 2d 774; *Morgan* v. *Andrews* (1895), 107 Mich. 33, 64 N. W. 869.

15. *Schechter* v. *United States* (1935), 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570.

ond Schwegmann case[16] upheld the validity of the McGuire Act and the Fair Trade Act with non-signer provisions as against the contentions that they violated due process and unlawfully delegated legislative power to private individuals.

As stated in the second Schwegmann case at pp. 791, 792 of 205 F. 2d:

"Whatever weakening effect on Old Dearborn may have been caused by Schwegmann's [the first Schwegmann case's] frank characterization of State fair trade statutes as involving price fixing against non-signers is more than off-set, it seems to us, by the weakening also of the broad concept against the validity of legislative price fixing assumed in Old Dearborn. For 'the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth Amendment.' [Citing Old Dearborn and other U. S. Supreme Court cases.]"

In connection with the test of whether an illegal fixing of prices had occurred, the court cited the case of *Nebbia* v. *New York* (1934), 291 U. S. 502, at p. 539, 54 S. Ct. 505, at p. 517, 78 L. Ed. 940, at p. 958, 89 A. L. R. 1469, at p. 1484, where the court said:

". . . Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

In determining whether there was an arbitrary, discriminatory, and unlawful price fixing or price control under the Fair Trade Act in question, the court in the

---

16. *Schwegmann Bros. Giant Super Mkts.* v. *Eli Lilly & Co.* (1953), *supra.*

second Schwegmann case concluded at p. 792 of 205 F. 2d:

"The . . . legislature has defined with particularity the type of commodity with respect to which fair trade prices may be established and enforced; namely, 'a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer of the commodity and which is in fair and open competition with commodities of the same general class produced by others.' It was, we think, within the province of the legislature to assume that economic laws constitute a sufficient restraint against capricious or arbitrary price fixing by the producer. As pointed out long ago by Louis D. (later Mr. Justice) Brandeis, the producer 'establishes his price at his peril—the peril that if he sets it too high, either the consumer will not buy or, if the article is, nevertheless, popular, the high profits will invite even more competition.' We agree with the learned District Judge that Old Dearborn still controls and, further, that, if it is to be overruled, that can be done only by the Supreme Court."

I do not believe this is the place for a prolonged discussion of whether Fair Trade appears to us to be good or bad for the economic or social life of the state.

Briefly stated, however, the proponents of Fair Trade contend that although it might appear at first blush that price cutting by a retailer is not harmful to a manufacturer, there is respectable opinion to the contrary—that the maintenance of a fair margin of profit encourages the retailer to offer a standard product of good quality to the public rather than to endeavor to substitute a sub-standard, or inferior product in an effort to meet price-cutting competition; that this, in time, affects the public.

The opponents of Fair Trade say that while in the bleak days of the 1930's there might have been some

justification for the Fair Trade, it is totally unnecessary in the prosperous inflation of the later 1940's and 1950's, and that unrestrained price-cutting by competing retailers is to the benefit of the general public. The two schools of thought on the subject have thus developed into keen controversy through the years. A sharp cleavage of views, in fact, has developed within departments of the U. S. government. The Federal Trade Commission, for example, has allegedly opposed resale price maintenance, while the Department of Commerce has apparently favored it, concluding "the case against Fair Trade is more theoretical than real." Committees of Congress have submitted divergent reports pro and con on the matter, and the debate appears still to be going on.

The opponents of Fair Trade, including some text writers and law journal contributors, ask, however, that we enter the argument of economics and decide in the light of present-day conditions against the wisdom of Fair Trade legislation, and thus hold it unconstitutional. However, I do not believe we can have one constitution in fair weather and an entirely different constitution in foul. This court does not sit as a super-legislature to weigh the propriety of legislation, nor to decide whether it expressly offends the public welfare. The legislative power has limits, but state legislatures have power to experiment with new techniques and use their own standard of the public welfare so long as specific constitutional prohibitions are not violated.[17]

And as to legislative policy, we should note that while numerous changes have been made in Congressional

---

17. See: *Day-Brite Lighting* v. *Missouri* (1952), 342 U. S. 421, 72 S. Ct. 405, 96 L. Ed. 469, (reh. den.) 343 U. S. 921, 72 S. Ct. 674, 96 L. Ed. 1334.

legislation in recent years affecting Fair Trade, in Indiana, however, no single amendment to the Fair Trade Act has been made since it was enacted some twenty years ago, but the legislation remains in exactly the form in which it was passed at that time. As stated in a recent case[18] at p. 211 of 106 A. 2d:

"The question before us is not the wisdom of this legislation; it is whether the situation presents a reasonable necessity for the protection of the public welfare, and whether the means bear a reasonable relation to the end sought. . . . And if these questions are fairly debatable, the legislative judgment must control."

Before concluding this opinion I think we should also observe that the U. S. District Court for the Southern District of Indiana has recently held the Fair Trade Act of Indiana with non-signer provisions is valid and constitutional as against the contentions that it violates due process and is an unlawful delegation of legislative powers,[19] and under the Indiana decisions that determination is highly persuasive upon this court.[20]

And not only is it the law in the federal courts that the Fair Trade Acts are not invalid as violating due process or being an unlawful delegation of legislative power in restricting prices, but the rule is followed in a majority of state courts.[21]

18. *General Electric Co.* v. *Klein* (1954), Del, 106 A. 2d 206.
19. *Sherwin Williams* v. *Bargain Barn, Inc.* (1954), 1954 CCH Trade Cases, No. 67,697.
20. *Midwestern Pet. Corp.* v. *State Board of Tax Com.* (1934), 206 Ind. 688, 187 N. E. 882, 191 N. E. 153.
21. *Scovill Mfg. Co.* v. *Skaggs, etc. Drug Stores* (1955), 45 Cal. 2d 881, 291 P. 2d 936; *Burche Co., Applnt.* v. *General Elec. Co.* (1955), 382 Pa. 370, 115 A. 2d 361; *General Elec. Co.* v. *Masters, Inc.* (1954), 307 N. Y. 229, 120 N. E. 2d 802; *Lionel Corp.* v. *Grayson-Robinson Stores* (1954), 15 N. J. 191, 104 A. 2d 304; *Lilly & Co.* v. *Saunders* (1939), 216 N. C. 163, 4 S. E. 2d 528, 125 A. L. R. 1308; *Triner Corporation* v. *McNeil* (1936), 363 Ill. 559, 2 N. E. 2d 929, 104 A. L. R. 1435.

If we are to have any certainty in the law, I do not believe constitutional principles should bend according to the winds of prosperity or adversity, nor should we attempt to engraft into the Indiana Constitution a different concept of due process and separation of powers from what those identical principles have been interpreted to mean under the Constitution of the United States.

I would reverse the judgment.

NOTE.—Reported in 143 N. E. 2d 415.